Deanna K. BENTON

v.

The KROGER CO.

Civ. A. No. G–85–207.

United States District Court,
S.D. Texas,
Galveston Division.

Aug. 15, 1986.

See also 635 F.Supp. 56.

Mark W. Stevens, Galveston, Tex., for plaintiff.

Carla Cotropia, Galveston, Tex., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HUGH GIBSON, District Judge.

On March 12, 1985, plaintiff Deanna K. Benton walked off her job at the League City Kroger Store after a heated confrontation with her supervisor, John Rothermel. Plaintiff then instituted two separate causes of action: a federal claim based on Title VII of the Civil Rights Act, and a state claim based on article 8307c of the Texas Workmen's Compensation statute.

Plaintiff contended that over a course of four months, John Rothermel sexually harassed her. She further contended that Rothermel discriminated against her because she had claimed Workers' Compensation. Denying plaintiff's contentions, The Kroger Company maintained that plaintiff had voluntarily quit her position and that Kroger did not rehire her because she had "cursed out" her supervisor.

On July 23, 1986, plaintiff waived her right to a jury trial in her state claim. The Court tried the two consolidated claims without a jury on July 23–25, 1986. After both sides rested, the Court dismissed plaintiff's article 8307c claim for insuffi-

cient evidence. As to plaintiff's Title VII claim, the Court now concludes that plaintiff has failed to prove a sexual harassment case. In accordance with Fed.R.Civ.P. 52, the Court now makes the following Findings of Fact and Conclusions of Law:

### Findings of Fact

1. The Kroger Co. is a chain grocery store incorporated in Ohio.

2. Plaintiff, Deanna Benton, worked for the Galveston Kroger store from November, 1982, until September, 1984. Her performance in this position was satisfactory.

3. Plaintiff is a 28-year-old divorcee and mother of two children. Prior to her employment with Kroger, plaintiff had worked as a bartender and a cocktail waitress. Plaintiff's past work history indicates that she is an assertive woman. On one occasion, during her employment with the Galveston Kroger store, plaintiff took the initiative to appeal a dispute over her vacation schedule beyond the store level. On another occasion, a male co-worker made offensive sexual advances to plaintiff. Plaintiff resisted and immediately reported the offensive behavior to her store manager, Roy Birkelbach.

4. In the summer of 1984, upon doctors' advice, plaintiff underwent a bilateral mastectomy and cosmetic reconstruction of her breasts. The adverse rumors in the store regarding plaintiff's surgery, coupled with plaintiff's desire to send her children to school in a different area, caused plaintiff to request a transfer to League City in September, 1984.

5. The League City Kroger store was newly opened. Kroger had transferred John Rothermel from another store to manage the League City operation. He brought with him, among others, three female employees: Mary Birch, Glenda Buchanan, and Karen Keesler. These women were nicknamed "stepdaughters" or "stepsisters"—a good-natured term referring to experienced employees who transferred together with Rothermel, denoting the idea that they all came from the same "family".

6. Kroger management rated Rothermel as a satisfactory store manager. Kroger has no record of any sexual harassment complaint ever brought against Rothermel.

7. Roy Birkelbach, manager of the Galveston Kroger Store, approved plaintiff's transfer to League City. Prior to the transfer, Birkelbach warned plaintiff that Rothermel, known as a tough manager, would be very difficult to work for. Contrary to plaintiff's testimony, Birkelbach denied having ever warned plaintiff of Rothermel's flirtatious nature or his reputation for making sexual advances to female employees.

8. Plaintiff continued to perform satisfactorily at the League City store. However, her work conditions could hardly be described as perfect. Plaintiff was scolded for taking excessive time off to attend to her child who had asthma. Plaintiff's request for overtime was rejected. Plaintiff, along with Mary Birch, was counseled for taking too many coffee breaks.

9. To substantiate her claim of sexual harassment, plaintiff testified on her behalf. Plaintiff stated that Rothermel assigned her the task of composing Public Address announcements each Tuesday afternoon in an isolated room. Rothermel would then come into the room to ask her out and to fondle her hair. According to plaintiff, Rothermel made several innuendos about sexual favors which plaintiff flatly rejected.

10. Plaintiff further asserted that Rothermel made sexual comments and lewdly gestured at plaintiff in the presence or within earshot of other employees and customers. Yet, plaintiff was unable to produce any witness' testimony to corroborate her claims. In fact, the few eyewitnesses to these incidents all took the stand and contradicted plaintiff.

11. For example, one of the alleged incidents of sexual harassment occurred in the presence of two other people: Mary Birch, a Kroger employee; and Jerry Spencer, a wine distributor for Kroger. Plaintiff testified that Rothermel blocked her way with

his legs, and invited plaintiff to "jump" over and to stop on his groin. Both eyewitnesses, Birch and Spencer, testified that Rothermel made no such sexual gestures or offensive comments.

12. During her employment at League City, plaintiff made no complaints about sexual harassment by Rothermel to anyone, including her two friends at work, Teresa Finley Bynum and Mary Birch. Birch, a union stewart, testified that although plaintiff had told Birch about the incident of sexual harassment at the Galveston store, plaintiff did not mention any improper conduct by Rothermel.

13. In February, 1985, Charles Barker, Kroger zone manager, visited the League City store. Plaintiff stopped Barker to inquire about Kroger's policy regarding her mandatory work hours. Barker testified that Rothermel was not present during the conversation. Nonetheless, plaintiff did not mention any incidents of sexual harassment to Barker. Although plaintiff knew Barker's wife personally, she never contacted Barker again until after she had walked off her job.

14. The last incident of alleged sexual harassment occurred approximately one month prior to plaintiff's resignation. On that occasion, plaintiff testified, Rothermel called plaintiff to his office and falsely accused her of abusing coffee break privileges. Plaintiff left Rothermel's office and, later on, returned to confront Rothermel. Since Rothermel was no longer there, plaintiff related the incident and Rothermel's previous acts of harassment to a co-manager, Kevin Gallagher. Gallagher acknowledged the conversation about coffee breaks, but testified that plaintiff did not mention sexual harassment.

15. No employees or patrons of Kroger had personal knowledge of any sexual harassment or improper conduct by Rothermel.

16. On or about March 10, 1986, Brenda Hamm, another co-manager, ordered plaintiff to unload potted plants from a trailer at the rear loading dock. Having unloaded about thirty plants, plaintiff began to feel pain and discomfort in her shoulders and back. She then protested the assignment and asked for help. Hamm told plaintiff that no other employee was available, and instructed plaintiff to return to her assignment. During the unloading, plaintiff once left the back door to the store open and unattended. Plaintiff did not notify any manager of her back pain and discomfort.

17. The following morning, plaintiff went to see a local chiropractor for back pain, only to find out that she might not be able to afford the examination. At the suggestion of the chiropractor's secretary, plaintiff allowed the doctor's office to contact Kroger to confirm workers' compensation coverage. Plaintiff spoke with Brenda Hamm, who asked that plaintiff report the following day to process a workers' compensation claim.

18. The following day, March 12, 1985, plaintiff reported to work and filled out a "notice of injury" form with Mark Finn, another co-manager. When Rothermel came to work that afternoon, Mark Finn and Brenda Hamm informed him of plaintiff's workers' compensation claim. Hamm also reported that plaintiff had left the back door unattended. Rothermel became visibly upset and demanded to see plaintiff at once.

19. Thereafter, a heated exchange of words between Rothermel and plaintiff took place in a back room, at which Finn was present. The contents and exact wording of the argument are disputed, but both sides apparently were angry and used fighting words. Toward the end of the argument, plaintiff cursed at Rothermel, declared "I quit", and stormed out. Plaintiff did not deny her use of profanity.

20. Mark Finn testified that plaintiff initiated the use of profanity and that the argument had no sexual overture. At the time of his testimony, Finn had quit Kroger to become self-employed.

21. The following day, plaintiff telephoned Charles Barker, the Kroger zone manager, at home to request that Barker rehire her for another store. After talking

to Rothermel and Finn, Barker decided not to rehire plaintiff.

22. Although Kroger did not dispute plaintiff's workers' compensation claim, plaintiff maintained that Rothermel, because of his own personal gain, retaliated against plaintiff for having filed the claim. Kroger has a policy of "charging back" Workers' Compensation payments, up to $7,500.00, to each store as operational costs. Each manager receives a bonus if he can reduce operational costs and business losses in order to maximize the store's profit. A Workers' Compensation claim up to the limit of $7,500.00 would only produce a difference of approximately $500.00 in the managerial bonus. Thus, Workers' Compensation costs alone do not significantly affect managerial bonuses.

23. Considering the totality of the circumstances surrounding plaintiff's termination of employment, the Court finds no retaliatory motive on the part of Rothermel or Kroger management. It is reasonable for management to want to know of injuries immediately after they occur. The March 12, 1985 confrontation did not reflect an attempt to discriminate against plaintiff or to force her into resigning.

■ 24. As to plaintiff's sexual harassment claim, the Court has before it two versions of the facts—one told by plaintiff, uncorroborated, and one consistently upheld by several witnesses, including those who had no ascertainable interest in Kroger. Choosing what version to believe is not merely a question of witness credibility, but also a question of what version logically makes better sense. The Court concludes that no sexual harassment took place so as to render the work environment hostile and abusive, or to justify a finding of "constructive discharge". The Court notes that the last incident of alleged sexual harassment took place a month before plaintiff's termination of employment. An abusive boss who intended to fire plaintiff would not have waited that long, nor would an outspoken employee whose rights had been violated have remained silent for that period.

■ 25. The Court further finds that plaintiff lost her temper as a result of unpleasant working conditions on previous days. She had been dissatisfied with the assignment of unloading plants, and had had problems getting treatment at the chiropractor's office. An inference that a boss may be crude and not so understanding, thereby making work life unpleasant for certain employees, is not proof of sexual harassment. Absent evidence to corroborate plaintiff's story, the Court is not willing to conclude that Rothermel had sexually harassed plaintiff.

■ 26. Kroger management was justified in not rehiring plaintiff.

### Conclusions of Law

#### A. Art. 8307c Claim

1. The Court has diversity jurisdiction over plaintiff's art. 8307c claim, *see* 28 U.S.C. § 1332.

2. Art. 8307c of the Tex.Rev.Civ.Stat. prohibits an employer from retaliation against an employee for having claimed Workers' Compensation benefits. TEX. REV.CIV.STAT.ANN. art. 8307c (Vernon Supp.1986).

■ 3. The plaintiff has the burden of establishing a causal link between her discharge and the claim for worker's compensation benefits. Once the link has been established, the employer must rebut the alleged discrimination by showing a legitimate reason for the discharge. *Hughes Tool Co. v. Richards*, 624 S.W.2d 598 (Tex. Civ.App.—Houston [14th Dist.] 1981, *writ ref'd n.r.e.*), *cert. denied*, 456 U.S. 991, 102 S.Ct. 2272, 73 L.Ed.2d 1286 (1982). The Court holds that plaintiff has failed to carry her burden. Accordingly, her claim of retaliatory discharge fails as a matter of law.

#### B. Title VII Claim

1. The Court has jurisdiction pursuant to 42 U.S.C. § 2000e and 28 U.S.C. § 1331.

2. Sexual harassment is a species of Title VII sex discrimination. *Bundy v. Jackson*, 641 F.2d 934, 942–45 (D.C. Cir.1981); *Moylan v. Maries County*, 792 F.2d 746, 750 (8th Cir.1986); *Simmons v. Lyons*, 746 F.2d 265, 270 (5th Cir.1984). The order and burden of proof in a Title VII case is well-established. First, plaintiff must establish a prima facie sex discrimination case. Second, the defendant must articulate some legitimate, non-discriminatory reason for the adverse treatment of plaintiff. Third, the plaintiff must prove, by a preponderance of the evidence, that the defendant's proffered reason is a pretext for discriminatory motives. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The plaintiff bears the ultimate burden of persuading the fact finder that sex discrimination took place.

3. Generally, a plaintiff can seek redress for sexual harassment by proving a "hostile environment" claim or a "quid pro quo" claim. *Jones v. Flagship International*, 793 F.2d 714 (5th Cir.1986), *adopting Henson v. City of Dundee*, 682 F.2d 897 (11th Cir.1982). Under either claim, plaintiff would have to prove the following elements: (1) she belongs to a protected group, (2) she was subject to unwelcome sexual harassment, (3) the harassment would not have occurred but for her gender, (4) the harassment affected a "term, condition, or privilege" of employment, and (5) the employer knew or should have known of the harassment in question and failed to take proper remedial action. *See Henson*, 682 F.2d 897 at 903–05; *Moylan, supra*, 792 F.2d at 750; *Jones, supra*.

4. In a "hostile environment" claim, the harassment must be "sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." *Henson*, 682 F.2d at 904. The plaintiff must show a practice or pattern of harassment against her; a single incident or isolated incidents generally will not be sufficient. *Moylan, supra*, 792 F.2d at 749; *Jones, supra*. Whether sexual harassment at the work place is sufficiently severe and persistent to affect the well-being of the employee is a question of fact to be determined in light of the total circumstances. *Henson*, 682 F.2d. at 904. Constructive discharge results only when job conditions are so unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign. *Bourque v. Powell Electrical Manufacturing Co.*, 617 F.2d 61 (5th Cir.1980).

5. In a "quid pro quo" claim, the plaintiff must show that her rejection of a sexual demand affects tangible aspects of employment conditions, terms, or privileges. *Jones, supra*. As in a typical disparate treatment case, the plaintiff must prove that the employer deprived her of a job benefit by using a prohibited criterion. *Jones, supra*.

6. The Court finds that in this case, the evidence preponderates against the plaintiff. Plaintiff has failed to persuade the Court that sexual harassment occurred at her work place, either by virtue of a "quid pro quo" demand, or by the existence of "hostile environment." Accordingly, plaintiff's sexual harassment claim must be DISMISSED.

7. If any of the foregoing findings of fact constitute conclusions of law, they are adopted as such. If any of the foregoing conclusions of law constitute findings of fact, they are adopted as such.