BORG–WARNER PROTECTIVE SER-VICES CORPORATION a/k/a Borg–Warner Physical Security Corporation d/b/a Wells Fargo Guard Services, Appellant,

v.

Amelia FLORES, Appellee.

No. 13–96–028–CV.

Court of Appeals of Texas, Corpus Christi.

Sept. 4, 1997.

Rehearing Overruled Nov. 13, 1997.

Joy M. Soloway, Stephen W. Smith, Andrew L. Pickens, Fulbright & Jaworski, Houston, Ofelia De Los Santos, Edinburg, for Appellant.

David H. Jones, Pharr, Aaron Pena, Jr., Kathleen Henley, Aaron Pena & Associates, Edinburg, for Appellee.

Before SEERDEN, C.J., and YANEZ and CHAVEZ, JJ.

## OPINION

CHAVEZ, Justice.

Borg–Warner Protective Services Corporation a/k/a Borg–Warner Physical Security Corporation d/b/a Wells Fargo Guard Services ("Borg–Warner") appeals the rendition of judgment in favor of Amelia Flores, a former Borg–Warner employee, on numerous common law and statutory claims for sexual harassment and related intentional torts. We will affirm.

### Facts

Borg–Warner is among this country's largest security firms.[1] Its McAllen, Texas, office is under the supervisory jurisdiction of its San Antonio, Texas, office. The McAllen field office, which, at the time of the events underlying this case employed up to 100 (or

---

1. Borg–Warner's 1994 annual report, published in the fiscal year prior the trial of this case, shows total operating profits in the sum of $77.2 million for 1994, and total operating profits in the sum of $110.3 million for 1993.

more—testimony was varied) security guards, was run by two Borg–Warner employees—operations manager Santiago "Jimmy" Gonzales, and security consultant Ruford "Rob" Richards. Essentially, Gonzales directly supervised the guards, and Richards was the firm's salesman. Gonzales and Richards had virtual autonomy in the day-to-day management of the McAllen office, as supervisory personnel from San Antonio would only visit the McAllen office between two and four times per year.

Prior to being hired to oversee all security guards in Borg–Warner's McAllen office, Gonzales had been employed as a school bus driver, janitor, farm field worker and a furniture delivery driver. Gonzales was an allegedly habitual sexual harasser *vis-a-vis* the female guards whom he supervised at Borg–Warner. Testimony concerning his misdeeds included:

- asking guards (including married ones) for dates and sexual favors, sometimes offering work-related incentives to submission;
- fondling the breasts of female employees;
- insisting that he be present in the bathroom to observe the giving of a female applicant's urine sample for the company's pre-employment drug test;
- calling and visiting, unannounced and often intoxicated, female guards at their homes;
- surreptitiously entering the home of appellee, a female guard who had spurned him; and
- raping appellee during a business outing, in the course of which transmitting gonorrhea to her.

Although Gonzales's misconduct was reported to Borg–Warner's management by Gonzales's female targets on several occasions, the record indicates that Gonzales was never reprimanded by his managers. Rather, it appears that Borg–Warner ignored and/or discredited each such report. The record indicates that Borg–Warner even requested that one female complainant reduce her grievance to a notarized written statement, as a precondition to its acceptance by management; having complied with Borg–War-

ner's request, her complaint was nevertheless apparently ignored.

Amelia Flores was hired by Borg–Warner in July, 1993, to be a security guard out of the McAllen office. The record reflects that, from the outset of her employment, she was a target of Gonzales's sexual advances. The record also reflects that, at the time Flores commenced employment with Borg–Warner, Gonzales had seen his superiors ignore and disbelieve numerous reports that he had sexually harassed female employees for about a year.

Incidents of Gonzales's inappropriate conduct toward appellee, set forth in the record, include the following: When Gonzales initially went to get Flores a uniform, he tried to kiss her and pin her to a desk in the office; after she started working, Gonzales began calling her at home; Gonzales promised Flores that she would receive favors at work if she would consent to sex with him; on one occasion, an apparently intoxicated Gonzales used a business pretext to appear at Flores's home, whereupon he tried to unfasten his trousers and pin her down; on another occasion, Gonzales appeared at Flores's home and tried to forcibly remove her skirt (this incident was admitted by Gonzales to his supervisor, Mike McEwen).

Finally, one afternoon in mid-August 1993, Flores paged Gonzales from her home to report an attempted auto theft which had been related to her by another Borg–Warner guard. Gonzales arrived at Flores's home, instructing her to accompany him to the crime scene in Gonzales's vehicle for the ostensible purpose of training Flores. *En route* to the attempted theft investigation, Gonzales took a detour down a dirt road, parked his car, and raped Flores, causing her to contract gonorrhea. After the rape, Gonzales returned Flores to her home, where she showered and "just kept crying and crying."

Flores testified that she attempted to report the rape—to no avail—to BorgWarner, stating that she "tried calling the office, but Jimmy [Gonzales] was—was the one always answering the phone. So, I couldn't get to nobody [sic] higher." Flores attempted to call Borg–Warner's office, in the ostensible

hopes of speaking to a managerial employee other than Gonzales, "several times." The following testimony was elicited on the direct examination of Flores:

Q: Did Jimmy [Gonzales] ever tell you who [sic] to complain to?

A: To him.

Q: Did he say to complain to him alone?

A: To him alone.

Q: And why didn't you want to complain to Jimmy [Gonzales] about the rape?

A: Because he was the one that committed it, how could I?

Flores was initially reluctant to report the rape to Borg–Warner, due to her observation of the company's response to the sexual harassment reported by fellow guard ·Patty Garcia.[2]  On September 7, 1993, Flores finally informed other persons—a co-worker and a Borg–Warner client—of the harassment and rape.  Flores testified that she did so "[b]ecause I needed to let it go out.  I had it all inside of me."

The client contacted Richards, to relate Flores's revelation.  Richards and Flores then met, and Flores reported the rape directly to Richards.  Richards asked Flores to remain quiet about the matter.  Borg–Warner offered Flores a few days off to compose herself.  Declining the offer, Flores resigned.

Richards then contacted McEwen in San Antonio, the primary person to whom reports of sexual harassment were to be given.  Richards also began keeping a journal of events.  Gonzales was placed on "administrative leave" practically immediately, but it is unclear from the record precisely when his employment with Borg–Warner was terminated.  At some point on September 7, 1993, some one from the San Antonio office of Borg–Warner called Flores to relate that Gonzales had been placed on "administrative leave"; however, Flores testified that she did not learn of Gonzales's actual termination until March 1995.

Subsequent to Flores's report of the rape, Gonzales continued to harass Flores, in an apparent attempt to silence her, even leaving at least one message on her telephone answering machine.[3]

Flores sued Borg–Warner and Gonzales on numerous theories, asserting common law causes of action as well as claims under Chapter 21 of the Texas Labor Code.[4] BorgWarner claimed that Gonzales had been upbraided for violation of a supposed non-fraternization policy, implying that sexual relations among Flores and Gonzales were consensual.[5]  Borg–Warner and Gonzales entered into a written contract whereby Gonzales would be provided legal representation, free of charge, as long as he did not contradict the legal positions taken by Borg–Warner.

Appellee's evidence against Borg–Warner focused on the following areas:

- Borg–Warner's investigation once Flores complained of harassment and rape;

- the company's remedial measures to prevent further incidents of sexual harassment;

- the existence of a sexually hostile work environment;

- the existence of sexual harassment safeguards to ensure the safety of female guards;

- whether Borg–Warner was negligent in hiring and retaining Gonzales; and

---

**2.** The following exchange occurred on redirect examination of Flores:

Q: Before you were raped did you know about [sic] Patty Garcia had claimed that she was sexually harassed at [Borg–Warner]?
A: Yes.
Q: Okay. And do you know what [Borg–Warner] did about Patty's complaint?
A: They never did nothing [sic] about it.
Q: Did that effect [sic] you when you thought about reporting what was going on with you?
A: Yes, I was scared to report it because they had already gotten a complaint from Patty Garcia and the company never did nothing [sic] about it.  *The company wouldn't listen to Patty when she complained about sexual harassment.*  I don't think I would have been raped if the company had taken procedures to protect Patty Garcia.... [Emphasis added.]

**3.** The tape-recorded message was admitted into evidence.

**4.** Gonzales is not ·a party to the instant appeal.

**5.** Such a policy does not appear in the record.

- the corporation's overall sexual harassment policy.

Expert testimony was also received that Flores suffered from "rape trauma syndrome" as a consequence of the rape.

Representatives of Borg–Warner who testified at trial repeatedly contradicted themselves, each other and their prior deposition testimony. For example, Walter Lepp, a human resources manager for Borg–Warner, testified that Gonzales was fired for violating a non-fraternization policy, although he stated that, hypothetically, the policy would not apply to two Borg–Warner employees who are living together.

The jury awarded actual damages as follows: [6]

| | |
|---|---|
| Past lost wages & benefits ("back pay") | $13,500 |
| Future lost wages & benefits ("front pay") | $350,000 |
| Past mental anguish | $20,000 |
| Future mental anguish | $60,000 |
| Past physical pain | $20,000 |
| Future physical pain | $0 |

Having determined liability, the trial progressed to the punitive damages phase.

In argument to the jury at the punitive damages stage, counsel for Flores stated:

... I want you to pay particular attention to the size of the award needed to deter similar wrongs in the future. This again goes back to the idea that the punishment figure has to be proportionate to different people. I can't ask you to punish Mr. Gonzales $4 million. That wouldn't be fair to him. The average person has a net worth of $35,000 the professor [*i.e.*, plaintiff's economics expert] says. I would submit to you—and, Amelia [Flores], please forgive me—that Mr. Gonzales's punishment should be $3,500 and I am going to tell you why.

Some of you may say ... that's not really appropriate for what he did and I agree. It is not appropriate. But I want to be consistent in my—in my recommendation to you that the punishment should be the same for him as it should be for the company. Mr. Gonzales is a little different than the corporation. Mr. Gonzales will pay in other ways. *I believe us to be compassionate people.* Because of your verdict, whenever Mr. Gonzales goes out to look for a job, his employer is going to be on notice because of your decision. They are going to be more careful and they are going to watch him a little more closely. So, he will suffer in a sense beyond the monetary damages that you will award against him. [Emphasis added.]

The jury determined punitive damages of $3,500 against Gonzales and $2,225,000 against Borg–Warner.

The trial court also awarded Flores attorney's fees in the amount of $339,509.86, as well as contingent fees for the successful representation of Flores at appellate tribunals. The court's trial fee award represents a fifty percent enhancement of the hourly fees proved up by plaintiff's counsel.

On appeal, Borg–Warner asserts ten points of error, summarized thus:

- Flores was not constructively discharged (legal & factual sufficiency);
- Flores is not entitled to the award of back pay (legal & factual sufficiency);
- Flores is not entitled to the award of front pay (legal & factual sufficiency);
- Pre-judgement interest should not have been awarded on actual damages;
- Texas Labor Code, Chapter 21, precludes Flores's recovery for intentional torts;
- Flores's counsel made an incurable ethnic plea when he stated, "I believe us to be compassionate people";
- Punitive damages were rendered in an unconstitutional amount; and
- Attorneys' fees were (a) enhanced, (b) determined by the trial judge, and (c) also awarded as a contingent fee for the successful representation of Flores at appellate tribunals.

### Standard of review

When considering the legal sufficiency of the evidence, we consider only the evidence and inferences that tend to support the jury's finding, and disregard all evidence and inferences to the contrary. *See Weirich v. Weirich,* 833 S.W.2d 942, 945 (Tex.1992). If

---

6. The damages question was not segregated according to particular causes of action.

there exists any evidence to support the finding, the point will be overruled and the finding upheld. *See Southern States Transp., Inc. v. State,* 774 S.W.2d 639, 640 (Tex.1989). In reviewing a factual sufficiency point, we must weigh all of the evidence in the record. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex. 1996). Findings may be overturned only if they are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.*

### Discussion [7]

#### Constructive discharge

■ A constructive discharge occurs when an employer makes conditions so intolerable that an employee reasonably feels compelled to resign. *Shawgo v. Spradlin,* 701 F.2d 470, 481 (5th Cir.1983), *cert. denied sub nom., Whisenhunt v. Spradlin,* 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 345 (1983); *Benton v. Kroger Co.,* 640 F.Supp. 1317, 1322 (S.D.Tex.1986). To find a constructive discharge, the trier must determine whether or not a reasonable person in the employee's position would have felt compelled to resign. *Pittman v. Hattiesburg Municipal Separate Sch. Dist.,* 644 F.2d 1071, 1077 (5th Cir.1981). It is necessary to examine the conditions imposed, not the employer's state of mind. *Bourque v. Powell Elec. Mfg. Co.,* 617 F.2d 61, 65 (5th Cir.1980). Therefore, an employee does not need to prove that an employer subjectively intended to force the employee to resign. *Hammond v. Katy Indep. Sch. Dist.,* 821 S.W.2d 174, 177 (Tex.App.—Houston [14th Dist.] 1991, no writ).

■ We also note that, under common-law agency principles, an employer is liable for an employee's wrongful acts, even if those acts are not committed within the actual scope of his employment, if the employee uses his apparent authority to accomplish the wrongful acts and so is acting within the "apparent scope" of his employment. *Martin v. Cavalier Hotel Corp.,* 48 F.3d 1343, 1352 (4th Cir.1995) (analyzing agency principles in Title VII case based on rape of hotel employee by her supervisor). The tort of an employee is within the course of his employment where the employee is endeavoring to promote his employer's business within the actual or apparent authority conferred upon the employee for that purpose. *See id.* The tortious act may be within the scope of the tortfeasing employee's apparent authority, and yet not be in the interest of the employer's business. *See id.*

The agency theory of employer liability rests on a logical foundation which has been simplified and set forth by Judge Posner as follows:

> Since the acts of a corporation are acts of human beings, to say that the "corporation" has committed some wrong (rather than just that it is liable under the doctrine of respondeat superior for an employee's wrong) simply means that someone at the decision-making level in the corporate hierarchy has committed the wrong; the deliberate act of such a person is the corporation's deliberate act. Whether *his* supervisors knew or should have known is irrelevant; it becomes relevant only where the wrong is committed by someone below the managerial level. [Emphasis in original.]

*Martin,* 48 F.3d at 1353 (quoting *Hunter v. Allis–Chalmers Corp.,* 797 F.2d 1417, 1422 (7th Cir.1986) (Posner, J.)).

Flores was raped by her immediate supervisor, Gonzales, in the course of an ostensible business outing; this fact is not disputed by Borg–Warner. Gonzales's tortious conduct regarding this incident is clearly attributable to Borg–Warner. Following the rape, Flores was informed by Gonzales that the corporate authority to whom the rape should have been reported was himself. Flores recognized the futility of reporting the rape to her attacker;

---

7. When reviewing a case brought pursuant to Texas Labor Code, Chapter 21, we may look not only to our Texas statutes, but also to the analogous federal provisions contained in Title VII. *See Eckerdt v. Frostex Foods, Inc.,* 802 S.W.2d 70, 72 (Tex.App.—Austin 1990, no writ). Because Texas has little case law interpreting and applying Chapter 21 of the Texas Labor Code, the federal court decisions addressing Title VII issues may provide us with guidance. *See, e.g., Farrington v. Sysco Food Serv., Inc.,* 865 S.W.2d 247, 251 (Tex.App.—Houston [1st Dist.] 1993, writ denied); *Benavides v. Moore,* 848 S.W.2d 190, 193 (Tex.App.-Corpus Christi 1992, writ denied).

nevertheless she sought—unsuccessfully—to reach other Borg–Warner management personnel in the McAllen office in the days following the rape. Having been frustrated in her attempts to bypass her attacker in reporting the rape, she finally divulged the details of the attack on September 7, 1993.

We believe the mere fact that the rape occurred establishes the constructive discharge of Flores.[8] *See, e.g., Martin,* 48 F.3d at 1353 n. 5 (noting that a hotel manager, by virtue of his position alone, effectively put his employer on notice of his rape of a subordinate, so that hotel/employer was liable under Title VII for the constructive discharge of the victim); *Al–Dabbagh v. Greenpeace, Inc.,* 873 F.Supp. 1105, 1110 (N.D.Ill.1994) ("[Plaintiff] claims that [the corporate defendant] violated her right under Title VII (specifically 42 U.S.C. § 2000e–2) not to be discriminated against on the basis of her sex by (1) failing to remedy a work environment that it knew was hostile toward women and then (2) *constructively discharging her for no other reason than that she had been raped. That is more than sufficient to state a claim under Title VII* [.]" [Emphasis added.] ). Assuming, *arguendo,* that the occurrence of the rape—standing alone—was not enough to establish the constructive discharge of Flores, the record reveals that Borg–Warner responded to the September 7, 1993, report by informing Flores that Gonzales had been placed on "administrative leave." Borg–Warner's response, couched in corporate personnel jargon, was certainly (and perhaps purposefully) ambiguous. We agree with appellee that a reasonable person in her position would have felt compelled to resign, which compels the finding of constructive discharge.

We hold that some evidence supports appellee's theory of liability premised on constructive discharge; in light of the entire record, the jury's finding is not clearly wrong and unjust. The third point of error is overruled.

### Back pay

■ Flores was, appropriately, awarded back pay, notwithstanding the fact that she

had failed to obtain stable employment after the occurrences giving rise to this suit. *See generally City of Austin v. Gifford,* 824 S.W.2d 735, 741 (Tex.App.—Austin 1992, no writ). At the time of her constructive discharge, Flores was earning $4.30 per hour. The trial occurred approximately two years after her discharge. Simple arithmetic, therefore, supports the award of back pay. We hold that some evidence supports appellee's theory of damages premised on backpay; in light of the entire record, the jury's finding is not clearly wrong and unjust. The first point of error is overruled.

### Front pay

■ "Front pay" refers to future lost earnings. *Hansard v. Pepsi–Cola Metro. Bottling Co.,* 865 F.2d 1461, 1469 (5th Cir. 1989), *cert. denied,* 493 U.S. 842, 110 S.Ct. 129, 107 L.Ed.2d 89 (1989). Although Chapter 21 of the Texas Labor Code does not literally mention the term "front pay," section 21.258(a)(2) does allow the court to order appropriate equitable relief. The question, then, is whether front pay is appropriate, and we have found no Texas cases that dispositively address this issue. However, federal cases do permit awards of front pay to claimants under Title VII of the Civil Rights Act of 1964, 42 U.S.C., section 2000e, *et seq.* ("Title VII"), even though Title VII itself makes no specific allowance for front pay. *See, e.g., Carter v. Sedgwick County, Kan.,* 929 F.2d 1501, 1505 (10th Cir.1991); *Johnson v. Chapel Hill Indep. Sch. Dist.,* 853 F.2d 375, 382 (5th Cir.1988).

Because one of the purposes behind Texas Labor Code, Chapter 21, is the correlation of state law to its federal counterpart, a trial court's award of front pay constitutes a legitimate exercise of its equity powers. *See, e.g., City of Austin,* 824 S.W.2d at 743–44. Flores testified that she would have worked as a guard until retirement. The jury was entitled to believe her. As with the award of back pay, simple arithmetic supports the award of front pay. We hold that some evidence supports appellee's theory of dam-

---

**8.** At this juncture, our view as to how the law of constructive discharge ought to be applied to the

instant facts diverges from that espoused by Chief Justice Seerden, as set forth in his dissent.

ages premised on front pay; in light of the entire record, the jury's finding is not clearly wrong and unjust. The second point of error is overruled.

### Prejudgment interest on future damages

■ We next consider whether TEX.REV. CIV. STAT. ANN. article 5069–1.05, section 6(a), allows prejudgment interest on future damages. We must conclude that it does. *C & H Nationwide, Inc. v. Thompson,* 903 S.W.2d 315, 324 (Tex.1994). Appellant, in its brief, recognizes that "this Court is bound by [the] holding" of *C & H Nationwide, Inc.* Therefore, the tenth point of error is without merit and is overruled.

### Preclusion of common law claims

■ Federal courts presented with the issue of Title VII preclusion of common law tort claims have determined that tort plaintiffs shall not be precluded from prosecuting their tort claims on account of their other Title VII claims. *See, e.g., Ivanhoe v. Gaby,* 616 F.Supp. 122, 122–23 (S.D.Tex.1985); *Stewart v. Thomas,* 538 F.Supp. 891, 894–97 (D.D.C.1982). Texas Labor Code, Chapter 21, exists, as does Title VII, to remedy important social ills, but we cannot interpret the statutes to preclude the very important function of common law remedies for intentional torts such as battery. The fourth and fifth points of error are overruled.

### Ethnic plea

■ Appeals to racial prejudice are prohibited. *Standard Fire Ins. Co. v. Reese,* 584 S.W.2d 835, 840 (Tex.1979). Trial judges have an axiomatic responsibility to police closing arguments; however, they should not be required to retry a case if a subtle or ambiguous argument does not result in harmful error. *Texas Employers' Ins. Ass'n v. Guerrero,* 800 S.W.2d 859, 869, (Tex. App.—San Antonio 1990, writ denied) (Biery, J., dissenting). The true test is the degree of prejudice flowing from the argument—whether the argument, considered in its proper setting, was reasonably calculated to cause such prejudice to the opposing litigant that a withdrawal by counsel or an instruction by the court, or both, could not eliminate

the probability that it resulted in an improper verdict. *Texas Employers' Ins. Ass'n v. Haywood,* 153 Tex. 242, 266 S.W.2d 856, 858 (1954).

In jury argument in the exemplary damages phase of the trial, counsel for Flores stated: "I believe us to be compassionate people." Viewed in context, there is no indication that the foregoing was a plea for Hispanic unity in imposing significant exemplary damages, as appellant suggests. To the contrary, counsel argued that Gonzales, notwithstanding the egregious nature of the tortious conduct for which he had been found liable, should not be punished disproportionately *vis-a-vis* Borg Warner. Further, no contemporaneous objection was lodged. Counsel's argument presents no error in accordance with the controlling standards, and the seventh point of error is overruled.

### Punitive damages

Appellant contends that the award of punitive damages violates (1) the Due Process clauses of the United States and Texas Constitutions, (2) the Excessive Fines clauses of the United States and Texas Constitutions, and (3) the Commerce Clause of the United States Constitution.

#### Due process

■ The United States Supreme Court has granted *certiorari* on issues relating to punitive damages and the inherent due process concerns, but "it has given lower courts no bright-line guidance." *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 12, n. 1 (Tex.1994). First, in *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 18, 111 S.Ct. 1032, 1043, 113 L.Ed.2d 1 (1991), the Court expressed concern about juries that "run wild" in awarding punitive damages.

In *Haslip,* the United States Supreme Court held that punitive damage awards do not violate the due process provision of the Fourteenth Amendment when the award is based on objective criteria. *Id.* The Court conceded that unlimited jury or judicial discretion in the fixing of punitive damages may invite extreme results that are unacceptable under the due process clause. *Id.* Therefore,

the general concerns of reasonableness and adequate guidance from the court must be considered in determining whether punitive damages are unconstitutional. *Id.*

The controlling precedents also expressly reject the application of a ratio-based approach for determining the constitutionality of punitive damage awards. *BMW of N.A. v. Gore,* 517 U.S. 559, ――――, 116 S.Ct. 1589, 1601–03, 134 L.Ed.2d 809 (1996) ("[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula...."); *TXO Prod. Corp. v. Alliance Resources Corp.,*509 U.S. 443, 459–64, 113 S.Ct. 2711, 2721–23, 125 L.Ed.2d 366 (1993) ("[W]e do not consider the dramatic disparity between the actual damages and the punitive award controlling in a case of this character."). We therefore reject appellant's ratio-based constitutionality argument.

In the instant case, the court's charge on punitive damages stated:

> "Exemplary damages" means an amount that you may in your discretion award as an example to others and as a penalty or by way of punishment, in addition to any amount that you may have found as actual damages.
>
> In determining whether an award of exemplary damages is reasonable, the jury is instructed to consider the following factors:
>
> 1) the nature of the wrong;
> 2) the frequency of the wrongs committed;
> 3) the character of the conduct involved;
> 4) the degree of culpability of the wrongdoer;
> 5) the situation and sensibilities of the parties concerned;
> 6) the extent to which such conduct offends a public sense of justice and propriety[;] and
> 7) the size of the award needed to deter similar wrongs in the future.

The trial court's instruction placed reasonable constraints on the exercise of the jury's discretion. We therefore conclude that the punitive damage award was based on objective criteria, and thus due process was not violated.

### Excessive fine

■■■ The United States Supreme Court held in *Browning–Ferris Indus. v. Kelco Disposal, Inc.,* 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989), that the excessive fines clause of the Eighth Amendment does not apply to awards of punitive damages in civil cases between private parties. The Texas Supreme Court has held that a civil penalty is excessive, and thus unconstitutional, when it becomes so manifestly violative of the constitutional prohibition against excessive fines as to shock the sense of mankind. *Pennington v. Singleton,* 606 S.W.2d 682, 690 (Tex.1980).

In the *Pennington* case, the Texas Supreme Court considered whether punitive damages violated Article 1, section 13 (excessive fines) of the Texas Constitution and the Fourteenth Amendment (due process) of the United States Constitution. The court held that whether such damages are excessive is determined by whether it was fixed with reference to the object it is to accomplish according to the seriousness of the wrong and the defendant's culpability. *Id.*

Flores sought to punish Borg–Warner and Gonzales for the latter's commission of a highly reprehensible pattern of conduct. Appellee's counsel implored the jury to render an award large enough to deter such tortious conduct in the future. The jury responded. Based on the extreme facts of this case, we cannot hold that a punitive award of $2,225,-000, *vis-a-vis* a corporate giant such as Borg–Warner, is unconstitutionally excessive.

### Commerce clause

Appellant contends that the punitive damages award violated the commerce clause of the United States Constitution, but failed to brief its argument. We therefore consider the argument unmeritorious. *See* Tex.R.App. P. 74(f).

The sixth point of error is overruled.

### Attorney's fees

Borg–Warner complains that attorney's fees were (a) enhanced, (b) determined by

the trial judge, and (c) also awarded as a contingent fee for the successful representation of Flores at appellate tribunals.

### Enhancement

In the instant case, the attorney's fees were, essentially, determined according to a "lodestar" calculation. Under this method, the court must first determine the number of hours reasonably spent by counsel on the matter, then multiply those hours by an hourly rate the court deems reasonable for similarly complex, non-contingent work. *City of Dallas v. Arnett,* 762 S.W.2d 942, 956 (Tex.App.—Dallas 1988, writ denied). That lodestar figure may then be adjusted upward or downward for certain factors known as multipliers, such as the complexity of the case, skill of the attorney, and contingent nature of the fee. *Crouch v. Tenneco, Inc.,* 853 S.W.2d 643, 649 (Tex.App.—Waco 1993, writ denied). In the instant case, a multiplier of 1.5 was used.

Flores was required to pierce numerous layers of corporate bureaucracy in order to bring her case to trial; further, the jury found in favor of Flores on all liability questions. Therefore, we see nothing infirm with this upward adjustment. Use of the lodestar approach to fee calculation was not erroneous.

### Determination by trial judge

As under Title VII actions, attorney's fees are awarded as part of "costs" in Texas Labor Code, Chapter 21, actions. *See Hall v. Savings of America,* 859 F.Supp. 1032, 1034 (S.D.Tex.1994). The general rule is that the right to costs is based entirely on statutes or procedural rules, and therefore the trial court is the proper authority to determine and award costs. *American Commercial Colleges, Inc. v. Davis,* 821 S.W.2d 450, 454 (Tex.App.—Eastland 1991, writ denied). Accordingly, Borg–Warner has no complaint in this regard.

### Contingent award

The award of appellate attorney's fees to the trial court winner is appropriate, provided they are conditioned on ultimate appellate success. *Chilton Ins. Co. v. Pate &*

*Pate Enterprises, Inc.,* 930 S.W.2d 877, 896 (Tex.App.—San Antonio 1996, n.w.h.); *CPS Int'l, Inc. v. Harris & Westmoreland,* 784 S.W.2d 538, 544 (Tex.App.—Texarkana 1990, no writ). We will not disturb the fee award on this ground, as the award is premised on the ultimate success of Flores.

The eighth and ninth points of error are overruled.

The judgment of the trial court is AFFIRMED.

SEERDEN, Chief Justice, concurring and dissenting.

I respectfully dissent from that part of the majority opinion that affirms the awards to Amelia Flores of damages for past and future wages based on her theory of constructive discharge.

Clearly, Amelia Flores has been seriously injured, physically, emotionally, and psychologically, by Gonzales' sexual harassment and rape of her. I completely agree with the majority that she is entitled to compensation from Borg–Warner for the wrongs committed against her by her supervisor. However, I cannot agree that she is also entitled to be compensated under the theory of wrongful termination, because I find no evidence in the record that Flores was in fact constructively discharged by Borg–Warner. It is on this narrow issue that I disagree with the majority. A review of what I consider to be the relevant facts is necessary to adequately state my reasoning.

Borg–Warner provides security services throughout the country, with a field office in McAllen, Texas, under the supervisory jurisdiction of its San Antonio, Texas, office. The McAllen field office was run by two Borg–Warner employees: Jimmy Gonzales, who directly supervised the guards; and Rob Richards, who was the company's salesman.

The evidence, viewed in the light most favorable to the jury verdict at trial, showed that Gonzales sexually harassed many of the female guards he supervised by, among other things, asking them for dates and sexual

favors, sometimes offering work-related incentives to submission, fondling their breasts, calling and visiting them at their homes unannounced.

When Amelia Flores began work as a security guard for Borg–Warner's McAllen office in July of 1993, Gonzales tried to kiss her and pin her to a desk in the office, he began calling her at home, and promised her that she would receive favors at work if she would consent to sex with him. Gonzales also appeared at Flores's home on two occasions, the first time trying to unfasten his trousers and pin her down, the second time trying to forcibly remove her skirt. Flores repeatedly rejected Gonzales' advances. Finally, in mid-August of 1993, while Gonzales and Flores were in Gonzales' vehicle traveling *en route* to an attempted theft investigation, Gonzales took a detour down a dirt road, parked his car, and raped her.

On September 7, 1993, Flores informed a Borg–Warner client of the sexual harassment and rape. Dorothy Bearden, the regional manager at Envisions and the person that Flores told about the rape, testified that on that same day she spoke to Richards and informed him about the rape. Bearden also testified that she informed Richards about other claims of sexual harassment by Flores' co-workers.

Richards then met Flores and Corona, the on-duty security guard at Envisions, at the Envisions offices, and was told about the experiences that Flores, Corona and other security guards, including Rodriguez, Garcia and Lara, had with Gonzales. Flores testified that Richards told her not to mention the rape to anyone, and that he would take care of it. Richards contends that Flores did not initially complain of rape when he spoke to her on September 7, 1993, but only that Gonzales had given her a sexually transmitted disease. Nevertheless, Richards then placed Gonzales on administrative leave and attempted to contact the other victims.

It is uncontroverted that, on the same day that the rape was reported to Richards, he contacted higher management at the San Antonio office and that same evening Mike McEwen, Borg–Warner branch manager, telephoned Flores. McEwen testified that he told Flores at that time that Gonzales had been terminated and asked her if she wanted a few days off with pay. Flores, however, denied that McEwen told her that Gonzales had been terminated, but agreed that McEwen told her that Gonzales was on administrative leave. Flores contends that she did not find out that Gonzales had been terminated before March of 1995.

Nevertheless, Flores resigned from Borg–Warner on September 7, !993, the same day that she had initially reported the rape. Flores testified that she resigned because of her continuing fear of Gonzales. Flores also wrote a formal letter of resignation to Richard, dated September 7, 1993, which she concluded by stating that she "would rather starve than continue working with a company that has allowed this to happen."

Flores and several other female security guards sued Borg–Warner and Gonzales on numerous theories, asserting common law causes of action as well as claims under Chapter 21 of the Texas Labor Code for sexual harassment.[1] Generally the plaintiffs contended that Borg–Warner allowed Gonzales to create a sexually hostile work environment. Specifically, Flores and co-employees Malissa Lara, Imelda Rodriguez, and Norma Corona, complain that Gonzales made inappropriate sexual advances against each of them, yet Borg–Warner failed to take any action against Gonzales when his misconduct was reported. The claims of each individual plaintiff were later severed, and Flores' claims against Borg–Warner proceeded to trial separately from the others.

The case was submitted to the jury on numerous special issues by which the jury found that Borg–Warner sexually harassed Flores, and that it intentionally inflicted emotional distress upon her, invaded her privacy, and negligently hired Gonzales. Without segregating the monetary amounts according to cause of action, the jury assessed damages for lost wages and benefits (past—$13,500 / future—$350,000), mental anguish (past—$20,000 / future—$60,000), and physical pain

---

1. Gonzales is not a party to the instant appeal.

(past—$20,000 / future—$0). The jury also assessed punitive damages of $3,500 against Gonzales and $2,225,000 against Borg–Warner. The trial court awarded Flores attorney's fees in the amount of $339,509.86, as well as contingent fees for the successful representation of Flores on appeal.

By its first three points of error, Borg–Warner challenges the legal and factual sufficiency of the evidence to show that Flores was constructively discharged, and to show that she was entitled to awards for past and future wages. In considering a "no evidence," "insufficient evidence" or "against the great weight and preponderance of the evidence" point of error, we follow the well-established test set forth in *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986); *Dyson v. Olin Corp.,* 692 S.W.2d 456, 458 (Tex.1985); *Glover v. Texas Gen. Indem. Co.,* 619 S.W.2d 400, 401–02 (Tex.1981); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965); *Allied Fin. Co. v. Garza,* 626 S.W.2d 120, 125 (Tex.App.—Corpus Christi 1981, writ ref'd n.r.e.); and Calvert, *No Evidence and Insufficient Evidence Points of Error,* 38 Tex. L.Rev. 361 (1960).

The Texas Human Rights Act prohibits an employer from discharging or otherwise discriminating against an individual with respect to compensation or the terms, conditions, or privileges of employment because of race, color, disability, religion, sex, or national origin. Tex. Lab.Code Ann. § 21.051 (Vernon 1996). The legislature modeled the Texas Human Rights Act on federal law with the purpose of executing the policies embodied in Title VII of the Civil Rights Act of 1964. *Ewald v. Wornick Family Foods Corp.,* 878 S.W.2d 653, 658 (Tex.App.—Corpus Christi 1994, writ denied). Accordingly, when reviewing a case brought pursuant to the Texas Act, we may look not only to the state statute, but also to the analogous federal provisions contained in Title VII and to federal cases interpreting Title VII. *Mackey v. U.P. Enterprises, Inc.,* 935 S.W.2d 446, 455 (Tex. App.—Tyler 1996, n.w.h.); *Eckerdt v. Frostex Foods, Inc.,* 802 S.W.2d 70 (Tex.App.—Austin 1990, no writ).

Under both the State and the Federal Acts, sexual harassment is recognized as a form of employment discrimination. *Ewald,* 878 S.W.2d at 658; *Syndex Corp. v. Dean,* 820 S.W.2d 869, 871 (Tex.App.—Austin 1991, writ denied) (citing *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 63–64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986)). A claim of sexual harassment may be actionable as *quid pro quo* harassment or hostile work environment harassment.

*"Quid pro quo"* sexual harassment is discriminatory behavior by a supervisor that compels an employee to elect between acceding to sexual demands and forfeiting job benefits, continued employment or promotion, or otherwise suffering tangible job detriments. *Ewald,* 878 S.W.2d at 658; *see also Highlander v. K.F.C. Nat'l Management Co.,* 805 F.2d 644, 648 (6th Cir.1986). "Hostile environment" sexual harassment occurs when the plaintiff is subjected to unwelcome sexual harassment affecting a term, condition, or privilege of employment, and the employer knew or should have known of the harassment and failed to take remedial action. *See Ewald,* 878 S.W.2d at 659.

In the present case, Flores obtained findings of both *quid pro quo* and hostile environment sexual harassment. Her primary theory of liability was that, as a result of sexual harassment by Gonzales and Borg–Warner, she was constructively discharged from her job there as a security guard. Accordingly, even though she may have established that she was sexually harassed, Flores must further prove that the harassment caused her constructive discharge.

The majority opinion, after reviewing the evidence of sexual harassment, summarily concludes that Gonzales' egregious conduct and the response by Borg–Warner's management to complaints against Gonzales are in themselves sufficient to support Flores' claim of constructive discharge. However, a closer analysis of the relevant law and its application to the facts of this case reveals a lack of support for her claim for constructive discharge.

The constructive discharge doctrine was first developed in unfair labor practice cases and serves as a legal substitute for the discharge element of a prima facie case of dis-

crimination under Title VII of the Civil Rights Act of 1964. *Hammond v. Katy Independent School Dist.,* 821 S.W.2d 174, 177 (Tex.App.—Houston [14th Dist.] 1991, no writ).[2] Constructive discharge occurs when an employer makes conditions so intolerable that an employee reasonably feels compelled to resign. *Davila v. Lockwood,* 933 S.W.2d 628, 630 (Tex.App.—Corpus Christi 1996, no writ); *Hammond,* 821 S.W.2d at 177. To find a constructive discharge, the fact finder must determine whether or not a reasonable person in the employee's position would have felt compelled to resign as a result of the employer's discriminatory conduct. *Hammond,* 821 S.W.2d at 177.

While I have found no Texas cases that elaborate on the elements required to find constructive discharge as a result of sexual harassment, the federal cases that have examined this issue generally require the employee to be reasonable in allowing the employer to correct the situation before her resignation may be viewed as a constructive discharge.

Once the employer is notified of the sexual harassment claim, it must be given sufficient time to remedy the situation before an employee may claim constructive discharge. *Kilgore v. Thompson & Brock Management, Inc.,* 93 F.3d 752 (11th Cir.1996). In *Kilgore,* female employees of a Pizza Hut restaurant claimed that they had been sexually harassed by a fellow employee. Pizza Hut was notified of the claim on Friday, and by the next Tuesday had initiated an investigation of the incident and called a meeting with the plaintiffs. The Eleventh Circuit rejected the plaintiffs' constructive discharge claim after they refused to return to work or attend the meeting.

Moreover, an employer's remedial action in response to a sexual harassment claim is sufficient if reasonably calculated to prevent further harassment. *Knabe v. Boury Corp.,* 114 F.3d 407 (3rd Cir.1997). The Third Circuit stated in *Knabe* that, "[i]f the remedy

chosen by the employer is adequate, an aggrieved employee cannot object to that selected action. Concomitantly, an employee cannot dictate that the employer select a certain remedial action." *Id.* at 414 (employee insisted that her harasser be fired or transferred as a condition for her continued employment ); *see also Buchanan v. Sherrill,* 51 F.3d 227, 229 (10th Cir.1995); *Saxton v. American Telephone and Telegraph Co.,* 10 F.3d 526, 537 (7th Cir.1993) (transfer of harasser or victim to another location is sufficient remedy to avoid claim of constructive discharge); *Dornhecker v. Malibu Grand Prix Corp.,* 828 F.2d 307, 310 (5th Cir.1987) (employee must be reasonable in allowing employer an opportunity to cure the problem before resigning).

In *Dornhecker,* the victim was harassed by a co-worker while on a business trip for her employer. Dornhecker was harassed by her co-worker's conduct in, among other things, putting his hands on her hips, dropping his pants in public, and touching her breasts. While still on the trip, Dornhecker complained to the company president, who told her that she would not have to work with that employee after the conclusion of the business trip, which would last a day and a half longer. However, Dornhecker discontinued the trip and resigned. The Fifth Circuit concluded that she had not given her employer a reasonable opportunity to cure the situation and thus could not support her claim for constructive discharge.

Accordingly, the jury in the present case was called upon to determine whether the conditions at Borg–Warner were so intolerable on September 7, 1993, that Flores reasonably felt compelled to resign on that day, under circumstances that would support her claim for constructive discharge. We must uphold the findings and judgment to that effect if more than a scintilla of evidence supports it. *Stafford v. Stafford,* 726 S.W.2d 14, 16 (Tex.1987). More than a scintilla of

---

**2.** In order to show a prima facie case of employment discrimination, the plaintiff must generally show 1) that he was a member of a protected class, 2) that he suffered an adverse employment action (e.g., termination or discharge), and 3) that non-protected class employees were not

treated similarly. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801–03, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Rios v. Texas Commerce Bancshares, Inc.,* 930 S.W.2d 809, 818 (Tex.App.—Corpus Christi 1996, writ denied).

evidence exists. where the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex.1994).

At the time that Flores resigned, she had already continued to work from the time of the rape in mid-August to September 7, 1993. Flores never reported to Borg–Warner any of the acts of sexual harassment that Gonzales committed against her before that time, allegedly because she was aware that Borg–Warner had done nothing about similar complaints made by co-worker Patty Garcia.[3] In addition, Flores claimed that she could not report the rape to Borg–Warner because Gonzales would always answer the telephone when she tried to call the office, and she was not aware of any other number to call, nor was she aware of anyone else to complain to.

However, on the same day that Flores' report of the rape was conveyed to Richards, he contacted the regional office and provisions were made to put Gonzales on administrative leave and to allow Flores a few days off with pay. The only "intolerable condition" that Flores could complain about at that point was the failure of Borg–Warner to immediately terminate Gonzales as a result of her accusations. Flores chose to resign immediately, even though the situation had been temporarily stabilized by placing Gonzales on administrative leave.

The majority asserts that the term "administrative leave" was corporate personnel jargon which should not have stopped a reasonable person from resigning. I disagree. Although Borg–Warner apparently did not explain the conditions of Gonzales' "administrative leave" to Flores, neither did she testify that she asked them what their plans or intentions were with regard to the investigation of her claims or Gonzales' future employment with Borg–Warner. "Leave" certainly

conveyed to Flores that Gonzales would not be working with her for some period of time. Whether such leave would be temporary or permanent would logically depend upon Borg–Warner's ultimate determination concerning the complaints against Gonzales. Flores was clearly unwilling to wait for that determination.

Moreover, merely because one co-worker that Flores was aware of had complained about sexual harassment in the past and been ignored was not a sufficient reason for her to assume that nothing would come of her own complaint that Gonzales had raped her, especially in view of the fact that the report generated an ·immediate response from Borg–Warner to remove Gonzales from the scene. The focus, for purposes of constructive discharge, is not on what Borg–Warner did with regard to complaints by other employees in the past, but rather what actions it took to address Flores' complaint just before she chose to resign. Flores' complaint did reach management officials at Borg–Warner and she was aware that they were in the process of responding to it. At that point, she could no longer reasonably claim that, because it had done nothing about a particular sexual harassment complaint against Gonzales in the past, Borg–Warner would do nothing about her complaint. In short, Flores must be reasonable in allowing her employer to respond to her complaint.

I conclude that the immediate removal of Gonzales from the workplace was, as a matter of law, a reasonable enough response from Borg–Warner to deny Flores' claim that the continuation of "intolerable conditions" (*i.e.*, sexual harassment in this case) forced her to resign. At that point, she was at least under a duty to retain her position until more permanent solutions to the problem could be explored. *See Knabe; Kilgore; Dornhecker.*

---

**3.** Garcia testified to an incident in which Gonzales had cornered her in an office, started touching her breasts, leaning against her, and attempted to kiss her, until she pushed him back. Garcia testified that she told Richards in July 1993 that she had been sexually harassed and that Gonzales had been asking her out on dates, but did not mention Gonzales' grabbing her

breasts. In July 1993, Garcia also spoke to a Mr. Mullins in the San Antonio office about the sexual harassment by Gonzales. Both Richards and Mullins asked Garcia to make a written statement, which she did and delivered it to Richards. However, nothing was done about Garcia's complaints.

Accordingly, I would hold that Flores failed to present legally or factually sufficient evidence to support her claim of constructive discharge and would sustain Borg–Warner's third point of error. I would reverse that portion of the judgment awarding damages to Flores for lost wages on the theory of constructive discharge.