V99704.aa1; City of Alamo v. Espinosa







NUMBER 13-99-704-CV

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI


____________________________________________________________________


CITY OF ALAMO AND ITS EMPLOYEES, AGENTS, AND ALL THOSE ACTING IN 

CONCERT WITH THEM OR AT THEIR DISCRETION, Appellants,


v.


ARTURO ESPINOSA, Appellee.

____________________________________________________________________


On appeal from the 93rd District Court of Hidalgo County, Texas.

____________________________________________________________________


O P I N I O N


Before Justices Hinojosa, Yañez, and Chavez (1)

Opinion by Justice Hinojosa

On April 7, 1998, appellee, Arturo Espinosa, was demoted from chief of the Alamo Police Department to a lesser position.
He sued appellants, the City of Alamo and its employees, agents, and all those acting in concert with them or at their
discretion (collectively "the City"), for monetary damages and injunctive relief, asserting causes of action for violations of:
(1) the Texas Whistle Blower Act ("TWBA"), (2) the Texas Commission on Human Rights Act ("TCHRA"), (3) the Texas
Open Meetings Act ("TOMA"), (4) Texas public policy, (5) his rights under the Texas Constitution to freedom of speech,
political expression, political affiliation and association, and (6) his right under the Texas Constitution to due process.

At trial, the jury answered every charge question in favor of Espinosa and found his damages to be $1,092,500, plus
attorney's fees. The trial court reduced the damages award to $50,000, as required by the applicable statutes, (2) awarded
Espinosa attorney's fees in the amount of $159,000 (plus future attorney's fees in the event of an appeal), ordered the City to
reinstate Espinosa as Chief of Police, and permanently enjoined the City from retaliating against Espinosa, "or from
improperly taking any other adverse action against [Espinosa] which would hinder [him] in the performance of his duties as
Chief of Police."

I. Background


The City contends, inter alia, that the evidence is legally and factually insufficient to support the jury's finding that
Espinosa's opposition to a discriminatory practice, or his filing of a charge of discrimination and a complaint under the
TCHRA was a motivating factor in the City's alleged retaliation against him. A review of the evidence presented at trial is,
therefore, necessary.

A. Undisputed Evidence


The Alamo City Charter provides that the chief of police can be terminated with or without cause on a majority vote of the
city commission. In November 1996, Espinosa was promoted from lieutenant to chief of the Alamo Police Department at a
salary of $30,000, with a possible $2,000 raise in six months, after an evaluation. When Espinosa was five years old, he
lost an eye in an accident; he wears an artificial eye. Espinosa is a certified police officer and a firearms instructor.

A city election was scheduled for Saturday, May 3, 1997. Marcelino Medina was running for a seat on the Alamo City
Commission. A few minutes before midnight on Friday, May 2, 1997, Tony Cortez arrived at the Alamo police station and
reported that Medina had assaulted him. Medina was elected to the Commission on May 3. On Monday, May 5, Espinosa
called Medina to tell him of Cortez's allegation. After consulting with Alamo Municipal Judge Alberto Garcia ("Garcia"),
Espinosa decided to turn the case over to the Hidalgo County District Attorney's Office. On June 3, 1997, District Attorney
Rene Guerra notified Espinosa that he had reviewed the investigation of the alleged assault and found the case "insufficient
in evidence."

Meanwhile, on May 15, 1997, Alamo city commissioner Patty Stanford filled out a City of Alamo Public Information
Request Form to obtain "all records, reports and complaint [sic] filed by Mr. Mr. [sic] Tony Cortez against Mr. Marcelino
Medina." The request was routed to Espinosa, who did not release the documents to Stanford. Espinosa noted on the form,
"at the recommendation of the municipal judge the D.A.'s office and myself this case was turned over to Rene Guerra for
review and investigation all request [sic] should be made . . . to the D.A.'s office. However copies of the reports were made
available to [city manager James] Pliska so that the city attorney could review them. Approval must be given by the city
manager."

In July, 1997, Espinosa requested the promised evaluation. Only two commissioners returned the completed evaluation
form. Stanford gave Espinosa a poor rating because of his handling of the Medina investigation, and Mayor Rudy
Villarreal gave Espinosa an average rating. No action was taken at that time on Espinosa's request for a $2,000 raise.

Medina assumed the office of city commissioner in November, 1997. (3) Espinosa was evaluated by four of the five
commission members in April, 1998. He received poor evaluations from Medina, Stanford and Troy Smethers. He
received an excellent evaluation from Mayor Rudy Villarreal. (4)

During an executive session of the April 7, 1998 city commission meeting, Espinosa was demoted from chief to lieutenant.
He retained the same salary and benefits. Lt. Belisario Lumbreras was appointed interim chief of police. The next day,
April 8, 1998, Espinosa filed a complaint with the Texas Commission on Human Rights ("TCHR"), alleging he had been
wrongfully demoted due to a "perceived disability and political retaliation." On April 9, 1998, Espinosa's attorney notified
the City that a complaint had been filed with the TCHR.

On April 24, 1998, the agenda of a special meeting of the Alamo City Commission was posted. The only items listed for
discussion were appointment of an "interim Chief of Police" and a "new Chief of Police." The commission meeting was
scheduled for April 28, 1998.

On April 27, 1998, Espinosa filed his Original Petition for Declaratory Judgment and Injunctive Relief. Attached to the
petition was an affidavit from Mayor Villarreal, stating that in his opinion, Espinosa had been demoted for political
reasons. On April 28, 1998, the trial court signed a temporary restraining order enjoining the City and its agents

from hiring, employing, swearing-in, installing, seating, empowering or taking any other actions that gives or conveys any
power of office commensurate with the position of the chief of police to the position currently or previously held by Arturo Espinosa.



According to the minutes of the April 28 special meeting, Villarreal informed the commission of the trial court's temporary
retraining order. City attorney Ricardo Alamia interpreted the order as forbidding the hiring of a permanent chief, but
allowing the appointment of an interim chief. Villarreal walked out of the meeting, stating that he "did not want to go
against any violations of the court order." A majority of the city commission (Medina, Smethers, and Stanford) voted to
hire Ruben DeLeon as interim chief of police at a salary of $36,000. (5)

On May 12, 1998, the trial court signed a temporary injunction prohibiting the City from hiring another chief of police,
including "the hiring or employment of an interim, temporary or replacement Chief of Police." The injunction also
reinstated Espinosa as chief, and prohibited the City from "doing any acts inconsistent with allowing Arturo Espinosa to
accomplish his responsibilities, duties and employment as Chief of Police of the City of Alamo." (6) The City created the
position of public relations director for DeLeon, and he retained his $36,000 annual salary. When the temporary injunction
was vacated, DeLeon became chief of police again.

On November 30, 1998, TCHR "administratively dismissed" Espinosa's complaint. On December 9, 1998, Espinosa
received a "Notice of Right to File a Civil Action" from TCHR.

B. Testimony of Arturo Espinosa

Espinosa testified that he had no problems, reprimands or complaints prior to the Medina incident.

Espinosa felt he could not release the police investigation files on Medina to Stanford under the Open Records Act
("ORA") and the City's policy concerning such requests. The ORA exempts from disclosure any information relating to a
criminal investigation. He did, however, provide copies of the requested documents to Alamo city manager James Pliska,
and Stanford could have obtained them from Pliska.

Since his demotion and the filing of the TCHR complaint, Espinosa has had many problems at work that he had never
previously encountered. Pliska "picked on" him. He has received a lot of criticism of his work since the demotion. In
April, 1998, the Alamo Police Department had only about half the officers it had funding for. It was Espinosa's duty to
recruit new officers.

Espinosa testified that his eyesight was "perfect," and that he had no impairment. He heard that Medina was "asking
around" about Espinosa's ability to function with one eye. However, he never personally heard Medina or any other
commissioner say anything about his artificial eye or possible impairment of vision. Donna police chief Michael Carreon
told Espinosa that Medina was asking if there was some reason Espinosa could be fired or demoted because of his eye.
There is no difference between the vision requirements for police chiefs and police lieutenants.

C. Testimony of Ruben DeLeon

At the time of trial, DeLeon was chief of the Alamo Police Department. He had served as police chief in Alamo once
before. Espinosa served as an officer under him then. DeLeon testified that Espinosa was an average police officer who
received no reprimands. He has heard two criticisms of Espinosa: (1) a stolen truck case in which the victim was unhappy
because "nothing was done," and (2) the Wilmoth case (7), in which the investigation was too slow. DeLeon was also
critical of Espinosa's handling of the Medina case. DeLeon would have gotten a statement from Medina about where he
was on the night of the alleged assault. DeLeon felt Espinosa made a bad judgment call in not taking a statement from
Medina.

After DeLeon became police chief, he made improvements at the City jail and obtained federal grants to increase police
officer salaries.

D. Testimony of Alamo City Commissioner Marcelino Medina

Medina denied knowing Espinosa had an artificial eye. He did not base his vote to demote Espinosa on the eye. Medina
does not remember Stanford or Smethers ever saying anything about Espinosa having a disability.

E. Testimony of Alamo Mayor Rudy Villarreal

Villarreal felt that Espinosa's demotion was not justified. Stanford gave Espinosa a low evaluation because he failed to
give her copies of the police investigation reports in the Medina case. However, Stanford had independent access to those
records. Villarreal felt the demotion was "politically motivated and personal . . . because it was something against Mr.
Medina." Villarreal has no problems with Espinosa's handling of the complaint against Medina. Espinosa took the case to
the municipal judge, who did not want to get involved because the case involved a city official.

There were no complaints about the city jail while Espinosa was chief. Villarreal saw photographs of jail conditions that
looked "doctored."

F. Testimony of Alamo City Commissioner Patty Stanford

At the time, Stanford thought Espinosa's handling of the Medina case was "political" because she felt he was doing a favor
for Villarreal. At the time of trial, she was not sure it was politically motivated. Espinosa could have investigated the case
further, and dropped the charges. Espinosa was incompetent because he did not talk to Medina before referring the case to
the District Attorney. There were no prior formal complaints about Espinosa. Stanford felt she was entitled to receive the
police reports in the Medina case because, as a city commissioner, she "overrides the charter," and she needed the reports to
evaluate Espinosa. Stanford believes she has an "implied power" to get such records without making a request under the
Open Records Act. Stanford denied making comments to Ethel Bachman concerning Espinosa's eye.

G. Testimony of Alamo City Manager James Pliska

Stanford filled out the records request in Pliska's office. Espinosa sent the information to Pliska because the Alamo city
manager has to approve all records before they can be released. Pliska was Espinosa's direct supervisor, and he could have
directed Espinosa to give the records to Stanford. Espinosa should not have been reprimanded for his handling of the
records request.

Pliska discussed the Medina case with Espinosa and his lieutenant. He thought it should be handled "very carefully"
because a commissioner was involved. He believes Espinosa should have investigated more. After he received a memo
that Espinosa intended to turn the case over to the district attorney, Pliska did not tell Espinosa to investigate more. He did
not tell Espinosa how to conduct police investigations. Pliska was Espinosa's supervisor "only in a management capacity . .
. not during police investigations." Espinosa was demoted because of the poor evaluations he received from Stanford and
Medina.

Pliska is not aware of any remarks by Medina concerning Espinosa's eye. No decisions were made based on Espinosa's eye. 
Pliska did not know that Espinosa had an artificial eye. He thought Espinosa had "lazy eye syndrome." Pliska once had a
judo instructor with this syndrome, and he was very good. Pliska never said Espinosa could not be a good police officer
because of his eye. In fact, he knew Espinosa was a good shot.

At the time of the demotion, Alamo had only about half the officers it could have hired. As a result, changes were made in
recruitment. Pliska asked DeLeon, who was then public relations coordinator, to go through police officer applications
with Espinosa and Lt. Lumbreras to speed up the process. Pliska did not reassign the hiring duties to DeLeon because
Espinosa had filed a discrimination claim, and no commissioner told Pliska to reassign these duties. At that time, all city
departments were consolidating training and hiring into the city manager's office. Espinosa sent one applicant to Pliska
without having done a drug test. The applicant later tested positive for drugs, and Pliska discovered he had been fired for
drug use.

DeLeon was not given additional money for the police department budget when he became chief. He does not recall the
commission moving $15,000 from another department's budget to the police department. DeLeon remodeled the police
station and increased the number of officers. Pliska asked Espinosa for a study on how to increase officer pay, but he never
complied.

H. Other Testimony

Ethel Bachman, an Alamo resident who was active on the Library Board and Neighborhood Watch Board, testified that
Stanford made remarks about Espinosa's appearance, including his eye, and that "they" were going "to get rid of" him.

Sgt. Albert Caballero, Jr., an Alamo police officer, testified about the improvements to the jail that were made after DeLeon
became chief.

Donna police chief Michael Carreon testified at his deposition that he never discussed Espinosa with Medina. Carreon
spoke with Martin Villarreal, who may have told him that Medina said something about Espinosa's eye.

Alamo commissioner Smethers testified that Espinosa's demotion was not based on his eye. Smethers did not think
Espinosa had an impairment. At the time he voted for the demotion, Smethers did not know about any litigation filed by
Espinosa.

Former Alamo police officer Martin Villarreal testified that Pliska and Officer Juan Silva "were planning a strategy and
they wanted me to go ahead and write down some of the reasons we thought or some of the issues that we should attack.
And one of those issues was that Lt. Espinosa was employed with the city, yet not meeting the standards of TCLOS [sic],
which was you have at least 20/20 vision."

II. Causes of Action for Monetary Damages

A. Cause of Action for Retaliation

for Filing a TCHRA Complaint


The Court's charge asked, and the jury answered, the following questions:

Question Number 1

 Was Arturo Espinosa's opposition to a discriminatory practice or the making or filing a charge of discrimination or filing a
complaint under the Texas Commission on Human Rights Act a motivating factor in the City of Alamo's retaliation, if any,
against Arturo Espinosa?

A "motivating factor" in an employment decision is a reason for making the decision at the time it was made. There may
be more than one motivating factor for an employment decision.

Answer "Yes" or "No."



Answer: Yes 

Question Number 2



Was disability a motivating factor in the City of Alamo's decision to take any adverse employment action, if any, against
Arturo Espinosa?

The Texas Commission on Human Rights Act provides that it is unlawful for an employer to deprive a qualified individual
with a disability of an employment opportunity because of that person's disability.

A "motivating factor" in an employment decision is a reason for making the decision at the time it was made. There may
be more than one motivating factor for an employment decision.

Answer "Yes" or "No."

Answer: Yes 

If you have answered question number 1 or 2 "Yes," then answer question number 3; otherwise do not [answer] question
number 3.

Question Number 3


What sum of money, if any, if paid now in cash, would fairly and reasonably compensate ARTURO ESPINOSA for his
damages, if any, that resulted from such conduct?

Consider the elements of damages listed below and none other. Consider each element separately. Do not include damages
for one element in any other element. Do not include interest on any amount of damages you find.

Answer separately, in dollars and cents for damages, if any.

 


 Lost earnings in the past between date of the discriminatory event and today;




Answer: $8,750.00 



 


 Lost earning capacity;




Answer: $50,000.00 



 


 Compensatory damages in the past which may include emotional pain and suffering, inconvenience, mental anguish,
loss of enjoyment of life and other nonpecuniary losses;




Answer: $100,000.00 



 


 Compensatory damages in the future which may include emotional pain and suffering, inconvenience, mental anguish,
loss of enjoyment of life and other nonpecuniary losses.




Answer: $125,000.00 

 

1. Sufficiency of the Evidence


In its first issue, the City complains the evidence is legally and factually insufficient to support the jury's answer to
Question Number 1 that the City retaliated against Espinosa for his opposition to a discriminatory practice or the filing of a
complaint with the Texas Commission on Human Rights.

The jury is the sole judge of the credibility of witnesses and is entitled to accept or reject any testimony it wishes, as well as
to decide what weight to give the testimony. Leyva v. Pacheco, 163 Tex. 638, 358 S.W.2d 547, 549 (Tex. 1962); ONI, Inc.
v. Swift, 990 S.W.2d 500, 502 (Tex. App.-Austin 1999, no pet.). The court of appeals may not reweigh the evidence and
set aside a jury verdict merely because it feels that a different result is more reasonable. Pool v. Ford Motor Co., 715
S.W.2d 629, 634 (Tex. 1986); see also Dyson v. Olin Corp., 692 S.W.2d 456, 458 (Tex. 1985)(J. Robertson, concurring).

a. Legal Sufficiency


Legal sufficiency issues are addressed as either "no evidence" or "matter of law" issues. Minyard Food Stores, Inc. v.
Goodman, 2001 Tex. App. LEXIS 4254, *4 (Tex. App.-Fort Worth June 28, 2001, no pet. h.); Gooch v. Amer. Sling Co.,
902 S.W.2d 181, 183 (Tex. App.-Fort Worth 1995, no pet.). When the complaining party on appeal did not have the
burden of proof at trial, we address the error as a "no evidence" point. Minyard Food Stores, 2001 Tex. App. LEXIS 4254
at *4; Gooch, 902 S.W.2d at 183-84. When the complaining party on appeal did have the burden of proof, we address the
issue as a "matter of law" challenge. Dow Chem. Co. v. Francis, 2001 Tex. LEXIS 37, *10, 46 S.W.3d 237, -- (Tex.
2001); Sterner v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989). In the instant case, the City did not have the
burden of proof on the issues of which it complains the evidence is insufficient. 

When an appellant challenges the legal sufficiency of the evidence to support a finding on which it did not have the burden
of proof at trial, it must demonstrate on appeal that no evidence exists to support the adverse finding. Croucher v.
Croucher, 660 S.W.2d 55, 58 (Tex. 1983); Casino Magic Corp. v. King, 43 S.W.3d 14, 19 (Tex. App.-Dallas 2001, no
pet.); II Deerfield Ltd. P'ship v. Henry Bldg., Inc., 41 S.W.3d 259, 264 (Tex. App.-San Antonio 2001, pet. denied).

When we review a "no-evidence" issue of legal sufficiency, we must view the evidence in a light that tends to support the
finding of the disputed fact and disregard all inferences to the contrary. Bradford v. Vento, No. 99-0966, 44 Tex. Sup. Ct.
J. 655, 2001 Tex. LEXIS 35, *9 (April 26, 2001); Weirich v. Weirich, 833 S.W.2d 942, 945 (Tex. 1992); Davis v. City of
San Antonio, 752 S.W.2d 518, 522 (Tex. 1988); see also Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors,
Inc., 960 S.W.2d 41, 48 (Tex. 1998); Hines v. Comm'n for Lawyer Discipline, 28 S.W.3d 697, 701 (Tex. App.-Corpus
Christi, no pet.). A legal sufficiency point must and may only be sustained when the record discloses: (1) a complete
absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only
evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; and (4)
the evidence established conclusively the opposite of the vital fact. Juliette Fowler Homes, Inc. v. Welch Assoc., 793
S.W.2d 660, 666 n. 9 (Tex. 1990). If there is more than a scintilla of evidence to support the finding, the legal sufficiency
challenge fails. Formosa Plastics, 960 S.W.2d at 48; Stafford v. Stafford, 726 S.W.2d 14, 16 (Tex. 1987). 

When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its
existence, the evidence is not more than a scintilla and, in legal effect, is no evidence. Kindred v. Con-Chem, Inc., 650
S.W.2d 61, 63 (Tex. 1983); II Deerfield Ltd., 41 S.W.3d at 264. The test for the application of this no evidence/scintilla
rule is: if reasonable minds cannot differ from the conclusion, then the evidence offered to support the existence of a vital
fact lacks probative force, and it will be held to be the legal equivalent of no evidence. Kindred, 650 S.W.2d at 63.

b. Factual Sufficiency


As with legal sufficiency issues, the standard of review on factual sufficiency issues depends on who had the burden of
proof at trial. Minyard Food Stores, 2001 Tex. App. LEXIS 4254 at *6. When the party attacking the adverse finding did
not have the burden of proof, the party must show that the evidence is insufficient to support the adverse finding. 
Id.;Molina v. Moore, 33 S.W.3d 323, 329 (Tex. App.-Amarillo 2000, no pet.); Gooch, 902 S.W.2d at 184. As we noted
above, the City did not have the burden of proof on the issues of which it complains the evidence is insufficient. 

When we review the factual sufficiency of the evidence supporting an issue on which the appellant did not have the burden
of proof, we must consider, weigh and examine all of the evidence to see whether it supports or undermines the jury's
finding. Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402, 406-07 (Tex. 1998); Molina, 33 S.W.3d at 329; Checker Bag
Co. v. Washington, 27 S.W.3d 625, 633 (Tex. App.-Waco 2000, pet. denied); see also Plas-Tex, Inc. v. United States Steel
Corp., 772 S.W.2d 442, 445 (Tex. 1989). We set aside the finding only when we find that the evidence standing alone is
too weak to support the finding or that the finding is so against the overwhelming weight of the evidence that it is
manifestly unjust and clearly wrong. Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996); Garza v. Alviar, 395 S.W.2d 821,
823 (Tex. 1965).

c. Applicable Law

Under the TCHRA, an employer commits unlawful retaliation if the employer discriminates against a person who opposes
a discriminatory practice, makes or files a charge, files a complaint, or testifies, assists or participates in any manner in an
investigation, proceeding or hearing. Tex. Lab. Code Ann. § 21.055 (Vernon 1996). In order to successfully assert a claim
of retaliatory discharge, the plaintiff must first establish a prima facie case of discrimination, which gives rise to a
presumption of discrimination. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000). In a "pretext"
employment discrimination case, the complainant must initially establish a prima facie case of discrimination. (8)
McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Quantum Chem. v. Toennies, No. 99-1042, 2001 Tex.
LEXIS 14, at *9 (Mar. 8, 2001). The exact elements of this showing will vary depending on the allegations. McDonnell
Douglas, 411 U.S. at 802. However, the plaintiff's burden at this stage of the case "is not onerous." Tex. Dep't of Cmty.
Affairs v. Burdine, 450 U.S. 248, 253 (1981). 

Once the plaintiff has made a prima facie case of discrimination, the burden of going forward shifts to the employer to
"articulate some legitimate, nondiscriminatory reason for the employee's rejection." McDonnell Douglas, 411 U.S. at 802.
The offer of a legitimate reason eliminates the presumption of discrimination created by the plaintiff's prima facie showing.
Burdine, 450 U.S. at 254. The burden shifts back to the complainant to show that the employer's stated reason was a
pretext for discrimination. Id. at 256; McDonnell Douglas, 411 U.S. at 805-07. The standard of causation for all TCHRA
unlawful employment practice claims is whether the complaint was a "motivating factor" for the alleged retaliatory
behavior and termination, regardless of how many factors influenced the employment decision. Quantum Chem., 2001
Tex. LEXIS 14 at *18.

To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in a protected activity, (2) an
adverse employment action occurred, and (3) there was a causal connection between participation in the protected activity
and the adverse employment decision. Wal-Mart Stores, Inc. v. Lane, 31 S.W.3d 282, 295 (Tex. App.-Corpus Christi 2000,
pet. denied); Graves v. Komet, 982 S.W.2d 551, 554 (Tex. App.-San Antonio 1998, no writ); Azubuike v. Fiesta Mart, Inc.,
970 S.W.2d 60, 65 (Tex. App.-Houston [14th Dist.] 1998, no writ). The burden then shifts to the employer to rebut the
presumption by presenting evidence of a legitimate, nondiscriminatory reason for its action. Graves, 982 S.W.2d at 554. 
Upon evidence of a legitimate, nondiscriminatory reason, the presumption disappears and the plaintiff has the burden to
prove the employer's articulated reasons are a pretext for discrimination. Id. at 555. A plaintiff's prima facie case,
combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to
conclude that the employer unlawfully discriminated against the employee. Reeves, 530 U.S. at 143.

The City argues that Espinosa's claim under this section must fail because he "is unable to show he was disabled as that
term is defined by TCHRA, and secondly, there is no evidence that anyone with the City of Alamo considered his glass eye
when deciding to reassign him." The City, however, misunderstands the requirements of a plaintiff in making a prima facie
case in a retaliation case.

Under the first prong of a prima facie case, the employee must demonstrate a good faith reasonable belief that the
underlying discriminatory practice of the employer violated the law. Cox & Smith, Inc. v. Cook, 974 S.W.2d 217, 224
(Tex. App.-San Antonio 1998, pet. denied) (citing Payne v. McLemore's Wholesale & Retail Stores, 654 F.2d 1130,
1140-41 (5th Cir. 1981)). The employee is not required to show that there was actual existence of an unlawful practice,
only that he held a good faith reasonable belief that the employer engaged in activity made unlawful by Title VII or the
TCHRA. Byers v. The Dallas Morning News, Inc., 209 F.3d 419, 428 (5th Cir. 2000); Payne, 654 F.2d at 1141; Cox &
Smith, 974 S.W.2d at 224.

A "disability" means "a mental or physical impairment that substantially limits at least one major life activity of that
individual, a record of such impairment, or being regarded as having such an impairment." Tex. Lab. Code Ann. §
21.002(6) (Vernon 1996 and Supp. 2001). Major life activities include caring for one's self, performing manual tasks,
walking, seeing, hearing, speaking, breathing, learning and working. See Still v. Freeport-McMoran, Inc., 120 F.3d 50, 52
(5th Cir. 1997) (citing 29 C.F.R. § 1630.2(i)). A "disability" under the TCHRA must be one which is "generally perceived
as severely limiting [the plaintiff] in performing work-related functions in general." Chevron Corp. v. Redmon, 745
S.W.2d 314, 318 (Tex. 1987); Azubuike, 970 S.W.2d at 63. 

There are three scenarios under which an individual may have a disability: (1) he may actually have a present disability; (2)
he has a record of a past disability; or (3) he is perceived by the employer as having a disability. Primeaux v. Conoco, Inc.,
961 S.W.2d 401, 404 (Tex. App.-Houston [1st Dist.]1997, no pet.); see also Anderson v. Gus Mayer Boston Store, 924
F.Supp. 763, 773 (E.D. Tex. 1996). An employee may be considered "disabled" under the TCHRA if he was regarded as
having an impairment that substantially limited a major life activity, whether he actually had the impairment or not.
Dutcher v. Ingalls Shipbldg., 53 F.3d 723, 727 (5th Cir. 1995); Primeaux, 961 S.W.2d at 404.

d. Analysis 

It is undisputed that Espinosa has an artificial eye. He testified that his vision was not impaired at all, that he had no
problems shooting a gun and was, in fact, a firearms instructor as well as a licensed peace officer. However, there is
evidence that Espinosa had a reasonable good faith belief that certain City officials perceived him as having a disability,
and that the perceived disability was a motivating factor in their decision to terminate Espinosa.

Ethel Bachman, who knew Alamo City Commissioner Patty Stanford socially and from working on various civic boards
with her, testified that in late November, 1997 (about six months before Espinosa was demoted), Stanford told her that
"they" were "going to get rid of [Espinosa]," and then "start[ed] commenting about his physical appearance and his eye."
Bachman testified that she told Espinosa of Stanford's comments.

Former Alamo police officer Martin Villarreal testified that Pliska wanted to investigate whether Espinosa met TCLEOSE
(9) vision standards. Espinosa testified that Michael Carreon told him that Medina was asking around about whether
Espinosa could be fired for some reason related to his eye. Carreon testified that Martin Villarreal told him Medina made
statements to that effect.

Espinosa admitted he had no present or past disability. However, there is at least some evidence that Espinosa had a
reasonable good faith belief that (1) his employer perceived him as having a disability and (2) such disability was a
motivating factor in his demotion. Therefore, we hold the evidence is legally sufficient to support the jury's finding on this
issue.

We have examined all the evidence adduced at trial. While it is true the City adduced evidence that its officials did not
perceive Espinosa as having a disability, the jury obviously believed otherwise. As we noted above, the jury is the sole
judge of the credibility of the witnesses and is entitled to accept or reject any testimony it wishes, as well as to decide what
weight to give the testimony; we may not reweigh the evidence and set aside a jury verdict merely because we might feel
that a different result is more reasonable. See Leyva, 358 S.W.2d at 549; ONI, Inc., 990 S.W.2d at 502; see also, Pool, 715
S.W.2d at 634; Dyson, 692 S.W.2d at 458. We hold that the jury finding on this issue is not so against the overwhelming
weight of the evidence that it is manifestly unjust and wrong. Consequently, the evidence is factually sufficient to support
the jury's finding on this issue. 

Additionally, the City argues that because Espinosa's demotion occurred before the filing of his TCHRA complaint, the
evidence is legally and factually insufficient to support the jury's finding in favor of Espinosa on this claim. However, the
demotion was not the only adverse employment action complained of by Espinosa. There was at least some evidence at trial
that, after his demotion and filing of the TCHRA complaint, Espinosa was subjected to retaliatory discrimination. 

Espinosa testified that he had no problems at work before his demotion, and that he was expecting a good evaluation at the
April 7 city commission meeting. After he was demoted and he filed his TCHRA complaint, Pliska began to "nitpick" his
work, including questioning Espinosa's investigation of several criminal cases. Pliska complained about Espinosa's
rejection of several applicants to the police department, and eventually gave the responsibility of hiring new police officers
to DeLeon, who at the time was not even employed by the police department. After he filed his TCHRA complaint,
Espinosa also began to receive complaints that he had not kept the city jail in good repair. Although Pliska and other
witnesses attempted to explain these actions, the jury clearly chose to disbelieve them. Accordingly, we hold the evidence
is legally and factually sufficient to support the jury's finding in favor of Espinosa on this issue. The City's first issue is
overruled.

2. Alleged Charge Error

In its second issue, the City contends the trial court erred in "submitting Question Number 1 to the jury without a timing
clause, or an indication that the employment decision pertaining to Arturo Espinosa would not have occurred when it did,
except for Arturo Espinosa's opposition to an alleged discriminatory practice."

a. Standard of Review

A party is entitled to a jury question, instruction or definition if the issue is raised by the pleadings and the evidence. Tex.
R. Civ. P. 278; see Houghton v. Port Terminal R.R. Ass'n, 999 S.W.2d 39, 45 (Tex. App.-Houston [14th Dist.] 1999, no
pet.). A trial court has broad discretion in deciding how to frame the issues submitted to the jury. Island Recreation Dev.
Corp. v. Republic of Tex. Savs. Ass'n, 710 S.W.2d 551, 555 (Tex. 1986); Wyndham Hotel Co. v. Self, 893 S.W.2d 630, 637
(Tex. App.-Corpus Christi 1994, writ denied). However, the submitted questions must fairly present disputed issues for the
jury's determination. Neuro-Developmental Assocs. v. Corporate Pines Realty Corp., 908 S.W.2d 26, 28 (Tex.
App.-Houston [1st Dist.] 1995, writ denied). 

b. Analysis

The Texas Supreme Court has established that the proper causation standard in a TCHRA case is "a motivating factor,"
regardless of how many other factors influenced the employment decision. Quantum Chem., 2001 Tex. LEXIS 14, at*18
(citing Tex. Lab. Code Ann. § 21.125(a) (Vernon 1996 & Vernon Supp. 2001)). We conclude the trial court utilized the
proper standard of causation, and the charge is not erroneous. The City's second issue is overruled.

B. Causes of Action for Disability Discrimination

and Violation of the TWBA

Because we have upheld Espinosa's cause of action against the City for retaliation, and the amount of damages awarded by
the jury for this cause of action exceeds the amount of monetary damages awarded in the final judgment, it is not necessary
for us to address the City's third, fourth, fifth, sixth, and eleventh issues regarding Espinosa's causes of action for disability
discrimination and violations of the TWBA. See Tex. R. App. P. 47.1. 

III. Causes of Action for Injunctive Relief

A. Claim for Violation of Article I, Section 8 of the Texas Constitution


In its seventh issue, the City contends there is no private right of action for the violation of rights guaranteed by article I,
section eight of the Texas Constitution, which provides: "Every person shall be at liberty to speak, write or publish his
opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the
liberty of speech or that of the press." Tex. Const. art. I, § 8. (10)

 In support of its contention, the City cites City of Beaumont v. Bouillon, 896 S.W.2d 143 (Tex. 1995). In Bouillon, the
Texas Supreme Court held that Texas recognizes neither an implied private right of action nor a common law cause of
action for damages for violation of constitutional rights. Id. at 147-49; see Haynes v. City of Beaumont, 35 S.W.3d 166,
182 (Tex. App.-Texarkana 2000, no pet.); Turner v. Tex. Dep't of Mental Health, 920 S.W.2d 415, 419 (Tex. App.-Austin
1996, writ denied); Harrison v. Tex. Dep't of Crim. Justice-Institutional Div., 915 S.W.2d 882, 888 (Tex. App.-Houston
[1st Dist.] 1995, no writ); City of Alamo v. Montes, 904 S.W.2d 727, 731 (Tex. App.-Corpus Christi 1995), writ granted,
judgm't vacated w.r.m., 934 S.W.2d 85 (Tex. 1996); Vincent v. W. Tex. State Univ., 895 S.W.2d 469, 475 (Tex.
App.-Amarillo 1995, no writ). However, the court acknowledged that a party may be entitled to "equitable protection."
Bouillon, 896 S.W.2d at 149; see Haynes, 35 S.W.3d at 182. 

In the instant case, Espinosa did not ask for monetary damages for the violation of his Article I, § 8 rights, nor was he
awarded monetary damages. Espinosa sought and was awarded reinstatement as chief of the Alamo Police Department.
The Texas Supreme Court has held that reinstatement is an equitable remedy per se. City of Midland v. O'Bryant, 18
S.W.3d 209, 218 (Tex. 2000); see Haynes, 35 S.W.3d at 183. Therefore, the remedy sought and received by Espinosa for
this claim was proper. The City's seventh issue is overruled.

B. Claims for Violation of TOMA and

Article I, Section 10 of the Texas Constitution

Because we have already upheld the award of injunctive relief for Espinosa's claim under Article I, section eight of the
Texas Constitution, it is unnecessary to address the City's eighth, ninth, and tenth issues regarding the propriety of
injunctive relief under Article I, Section 19 of the Texas Constitution and the Texas Open Meetings Act. See Tex. R. App.
P. 47.1.

IV. Award of Attorney's Fees

In its twelfth and final issue, the City contends the trial court erred in submitting Question Number 13 (concerning the
amount of attorney's fees, if any, to be awarded) without requiring the jury to apportion attorney's fees "as to those incurred
in prosecuting Arturo Espinosa's First Amendment claim, Whistle Blower claim, and Open Meetings Act claim." The City
also asserts the award of these fees is not warranted.

The trial court's charge asked, and the jury answered, the following question:

Question Number 13

What is a reasonable fee for the necessary services of Arturo Espinosa's attorneys in this case, stated in dollars and cents?

 


 For preparation and trial.




Answer: $80,000.00 



 


 For an appeal to the Court of Appeals




Answer: $25,000.00 



 


 For making or responding to an application for writ of error to the Supreme Court of Texas.




Answer: $6,000.00 



 


 If application for writ of error is granted by the Supreme Court of Texas.




Answer: $15,000.00 



A. Failure to Segregate Attorney's Fees

Generally, a party seeking an award of attorney's fees must show that the fees were incurred on a claim that allows recovery
of such fees, and thus, is ordinarily required to segregate fees incurred on claims allowing recovery of such fees from those
that do not. Stewart Title Guar. Co. v. Aiello, 941 S.W.2d 68, 73 (Tex. 1997); Stewart Title Guar. Co. v. Sterling, 822
S.W.2d 1, 10 (Tex. 1991). However, when the claims are "dependent upon the same set of facts or circumstances and are
thus intertwined to the point of being inseparable, the party suing for attorney's fees may recover the entire amount covering
all claims." Aiello, 941 S.W.2d at 73 (citing Sterling, 822 S.W.2d at 11); see Gill Sav. Ass'n v. Chair King, Inc., 783
S.W.2d 674, 680 (Tex. App.-Houston [14th Dist.] 1989), modified, 797 S.W.2d 31 (Tex. 1990); Flint & Assocs. v.
Intercontinental Pipe & Steel, Inc., 739 S.W.2d 622, 624-25 (Tex. App.-Dallas 1987, writ denied). When the issues are
integrally related to the claims upon which recovery of attorney's fees is based, full recovery of attorney's fees should be
allowed, even if some of the issues are also related to other matters. See Aiello, 941 S.W.2d at 73.

In the instant case, the issues raised in Espinosa's various claims stem from the same set of facts and circumstances
surrounding his demotion. After reviewing the record, we conclude the issues in each claim are so intertwined that
segregation would be impracticable. See World Help v. Leisure Lifestyles, Inc., 977 S.W.2d 662, 684 (Tex. App.-Fort
Worth 1998, pet. denied).

B. Amount of Attorney's Fees Awarded

At the hearing on Espinosa's motion for entry of judgment, Espinosa's counsel argued that under the TCHRA, the trial court
could award additional attorney's fees using the "lodestar" method. The trial court agreed, and awarded Espinosa an
additional $79,000 for attorney's fees incurred through trial, resulting in a final judgment of $159,000 for such attorney's
fees. The City now asserts this amount "was not warranted."

This Court has previously held that where a claim is based on employment discrimination under the TCHRA, the trial court
may award attorney's fees as part of the costs. Tex. Lab. Code Ann. § 21.259(a) (Vernon 1996); Gorges Foodservice, Inc.
v. Huerta, 964 S.W.2d 656, 673 (Tex. App.-Corpus Christi 1997, no writ); Borg-Warner Protective Servs. Corp. v. Flores,
955 S.W.2d 861, 870 (Tex. App.-Corpus Christi 1997, no pet.). The lodestar method may be used in calculating such
additional attorney's fees. Gorges, 964 S.W.2d at 673; Borg-Warner, 955 S.W.2d at 870.

Under the lodestar method, the court must first determine the number of hours reasonably spent by counsel on the matter,
then multiply those hours by an hourly rate the court deems reasonable for similarly complex, non-contingent work. 
Borg-Warner, 955 S.W.2d at 870; City of Dallas v. Arnett, 762 S.W.2d 942, 956 (Tex. App.-Dallas 1988, writ denied). 
That lodestar figure may then be adjusted upward or downward for certain factors (known as multipliers) such as the
complexity of the case, skill of the attorney, and contingent nature of the fee. Gen. Motors Corp. v. Bloyed, 916 S.W.2d
949, 960 (Tex. 1996); Borg-Warner, 955 S.W.2d at 870; Crouch v. Tenneco, Inc., 853 S.W.2d 643, 649 (Tex. App.-Waco
1993, writ denied). Factors considered may include having "to pierce numerous layers of . . . bureaucracy in order to bring
[the] case to trial," and whether the jury found in favor of the plaintiff on all liability questions. Borg-Warner, 955 S.W.2d
at 870. See Gen. Motors Corp., 916 S.W.2d at 960 (discussing lodestar factors in class action suit, such as benefits obtained
by class, complexity of issues involved, expertise of counsel, preclusion of other legal work due to acceptance of case, and
hourly rate customarily charged in region for similar legal work). 

In the instant case, Espinosa's attorney requested a multiplier of one (the $79,500 actually awarded by the jury), two
($159,000) or two-and-a-half ($198,750). The trial court obviously chose a multiplier of two. The parties stipulated that
the testimony of Espinosa's counsel regarding attorney's fees adduced during the trial would be considered as having been
presented at the hearing. At trial, Espinosa's counsel testified that he had practiced law for about twelve years, that he was
one of only two attorneys in South Texas who were board certified in labor and employment law, and that although the
hourly rate for his services was about $200 per hour, he customarily charged a contingent fee in employment discrimination
cases because few plaintiffs can afford his hourly rate. He charged about $150 per hour for the work of his associate
attorneys. He testified that he had personally spent some 300 hours on this case, and that his associate had spent about 130
hours, resulting in a fee of $79,500.

The instant case is obviously a complex one, involving numerous theories of recovery and a mountain of evidence. The
record reveals that a vigorous discovery process occurred, as well as a number of pre-trial hearings. The trial itself lasted
some nine days; testimony was taken from over twenty witnesses. The jury found in favor of Espinosa on all issues
submitted. Consequently, we conclude the trial court's award of additional attorney's fees under the lodestar method was
not erroneous. See Borg-Warner, 955 S.W.2d at 870. The City's twelfth issue is overruled.

The judgment of the trial court is affirmed.

 

FEDERICO G. HINOJOSA

Justice





Do not publish. Tex. R. App. P. 47.3.



Opinion delivered and filed this the

31st day of August, 2001.

1. Retired Justice Melchor Chavez, assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to
Tex. Gov't Code Ann. § 74.003 (Vernon 1998).

2. See Tex. Lab. Code Ann. § 21.2585(d)(1) (Vernon 1996 & Supp. 2001) (limiting award of certain compensatory and
punitive damages to $50,000 when respondent has fewer than 101 employees); Tex. Gov't Code Ann. § 554.003(c) (Vernon
Supp. 2001) (limiting award of certain compensatory and punitive damages to $50,000 when respondent has fewer than
101 employees). At the hearing on his motion to enter judgment, Espinosa conceded he could recover only a single
$50,000 award from the City.

3. The delay in Medina's assumption of office was due to a legal wrangle over whether the city commission seat for which
he ran was actually vacant. The previous commissioner, Ponciano Garcia, had been removed for missing too many city
commission meetings. The removal was upheld, and Medina took office.

4. Commissioner Eleazar Escobedo did not fill out an evaluation on Espinosa, and he abstained from the vote on
Espinosa's demotion at the April 7, 1998 commission meeting.

5. The record shows that DeLeon, a "good friend" of Medina, was hired at the meeting without having been interviewed by
the commission, and despite having been convicted of insurance fraud. DeLeon's peace officer's license was suspended
after he became police chief when the licensing agency found out about his insurance fraud conviction.

6. The May 12 injunction order was vacated by this court on January 28, 1999 in an unpublished opinion. City of Alamo v.
Espinosa, 1999 Tex. App. LEXIS 617, *8 (Tex. App.-Corpus Christi 1999, no pet.).

7. Pliska accused an elderly Alamo resident named Wilmoth of assault after the two men had a heated argument at City
Hall over Wilmoth's request under the Open Records Act for certain city documents. Pliska claimed Wilmoth poked him in
the chest with his finger. Wilmoth was later acquitted of the charge in Alamo municipal court.

8. The other type of employment discrimination case is the "mixed motive" case, in which the plaintiff has direct evidence
of discriminatory animus. See Quantum Chem.v. Toennies, No. 99-1042, 2001 Tex. LEXIS 14, at*8 (Mar. 8, 2001). The
direct evidence shifts the burden of proof to the employer to show that legitimate reasons would have resulted in the same
decision regardless of any discriminatory motives. Price Waterhouse v. Hopkins, 490 U.S. 228, 244-45 (1989); Starceski v.
Westinghouse Elec. Corp., 54 F.3d 1089, 1095-99 (3rd Cir. 1995). To qualify for mixed-motive treatment, a plaintiff must
show by direct evidence that an illegitimate criterion was a substantial factor in the decision. Price Waterhouse, 490 U.S.
at 276 (O'Connor, J., concurring) (emphasis added). Espinosa adduced no such evidence in this case; therefore the case
must be analyzed as a pretext case.

9. Texas Commission on Law Enforcement Officer Standards and Education.

10. Espinosa's theory under this cause of action was that he was demoted because Medina, Stanford, and Smethers, who
were politically aligned, viewed his handling of Medina's case as politically favoring their rival, Villarreal. Because the
City has not challenged the sufficiency of the evidence supporting the jury's finding in favor of Espinosa on this issue, we
have not summarized the evidence relevant to this issue. However, to place the issue in context, we note the record is
replete with evidence of a pattern of political discrimination between two warring political factions in the City of Alamo. 
For example, there were five police chiefs in a six-year period. The evidence tended to show that each time one faction
obtained a majority of the votes on the city commission, it would terminate city employees who were politically aligned
with the opposing faction, and replace them with its own supporters.