COURT OF APPEALS









COURT
OF APPEALS

EIGHTH
DISTRICT OF TEXAS

EL
PASO, TEXAS

 

DILLARD DEPARTMENT STORES,
INC.         )

and DILLARD=S TEXAS OPERATING               )               No. 
08-03-00076-CV

LIMITED PARTNERSHIP d/b/a
DILLARD=S,     )

                                                                              )                    Appeal from the

Appellants,                         )

                                                                              )            
County Court at Law #3

v.                                                                           )

                                                                              )           
of El Paso County, Texas

SABRINA HECHT,                                              )

                                                                              )                
(TC# 2000-2421)

Appellee.                           )

                                                                              )

 

 

O P I N I O N

 

This is an appeal
from a wrongful termination suit. 
Appellants, Dillard Department Stores, Inc. and Dillard=s Texas Operating Partnership d/b/a
Dillard=s (ADillard=s@) appeal a jury verdict in favor of
Appellee, Sabrina Hecht.  The jury
awarded Ms. Hecht $9,072.46 in lost earnings and employee benefits in the past,
$2,000 for necessary medical care in the past, $40,000 for mental anguish in
the past, and $125,000 in exemplary damages. 
On appeal, Dillard=s
raises three issues:  legal and factual
sufficiency points and jury charge error. 
We reverse and modify the trial court=s
judgment and affirm as modified.








In August of 1994,
Sabrina Hecht began working as a sales associate for Dillard=s in the Juniors Department.  She was transferred to the hosiery department
in 1996.  Her duties included sales,
customer service, orderly array, and stocking. 
Ms. Hecht was described by managers and coworkers as a good employee, a
very hard worker, and someone who loved working at Dillard=s. 
She was well liked by her coworkers and made an extra effort to help
customers and other associates.

On about March 7,
1998, Ms. Hecht was injured while stocking merchandise on the sales floor.  She testified that she had been stocking for
several days in preparation for an upcoming annual sale.  She had been lifting boxes and as she came up
from a bent position, she felt a sharp, stabbing pain in her lower back.  This happened at the end of her shift, about
4 p.m. and she did not report her injury at that time.

Three days later,
Elizabeth Cole, a cosmetic department manager, noticed that Ms. Hecht was
moving strangely and asked her what was wrong with her back.  Ms. Hecht told her story and Ms. Cole filed
an accident report.  Ms. Hecht was
immediately sent to Concentra Medical Center, in accordance with store policy.

Ms. Hecht was
initially seen by Dr. Becker, who released Ms. Hecht to work with light duty
restrictions[1].  Ms. Hecht maintained, however, that even
though she was told by Ms. Andrea Martinez, the operations manager, that some
light duty work would be found for her, between the date her injury was
reported and March 21, she was sent home every day on the basis that there was
no light duty work available.








On March 16, Ms.
Deanna Honicker, a secretary at Dillard=s,
told Ms. Hecht that she needed to come in to the store to pick up some
paperwork to take to Dr. Becker and it needed to be done right away.  On her way to Dillard=s,
Ms. Hecht was involved in an automobile accident.

The next day, Dr.
Becker treated her work related injury but would not treat her for the injuries
resulting from the car accident.  On
March 19, she started feeling pain in her neck and upper back and found Dr.
Ruja, a chiropractor, in the yellow pages, and got an appointment for March 21,
1998.  Eventually Dr. Ruja took over
treatment for all of her injuries, including the job related injuries because
it was more convenient to simply have one doctor.  Ms. Hecht testified that Ms. Martinez became
mad when she notified Dillard=s
that she had switched doctors.

Dr. Ruja=s orders restricted her from any work
until she was released to work with light duty restrictions on June 1,
1998.  The light duty restrictions
provided for no lifting over thirty pounds and no repetitive bending or lifting.

Ms. Martinez
testified that she handled the personnel issues and that she had received
training regarding things pertaining to personnel issues such as the Family
Medical Leave Act and Workers=
Compensation leave of absence.  According
to Ms. Martinez, when Ms. Hecht was originally injured on March 7, 1998, she
was placed on sick leave.  She also
testified that there is no light duty at Dillard=s
other than for the employees on workers=
compensation and that Dillard=s
will create a job for someone on workers=
compensation.  Finally, she testified
that she did not remember Ms. Hecht asking her personally for accommodations,
but she believed that Ms. Hecht asked Ms. Marva Putman, the store manager.








Ms. Putman
testified that she did not know about Ms. Hecht=s
injury until after Ms. Hecht returned to work on light duty on June 1,
1998.  She testified that it is Dillard=s policy to follow the restrictions a
doctor places on an employee.  If the
restriction is light duty, she testified that employees often times can sort
size noodles, clean silver, or wrap gifts. 
She confirmed that when Ms. Hecht returned, she asked Ms. Putnam for
accommodations and specifically asked for light duty.  Ms. Putman stated that although Ms. Hecht had
requested a transfer from the hosiery department, the hosiery department
required the least amount of heavy lifting. 
Ms. Martinez testified much the same, that given the restrictions, Ms.
Hecht could return to the hosiery department which she believed was the
lightest duty department available.

Ms. Hecht
testified to the contrary that she was the only person assigned to hosiery and
that though she continually asked for light duty, she was told repeatedly that
none was available.   She claimed that
both Ms. Martinez and Ms. Putman had promised her a light duty position and
that they were looking for one, but that in the meantime, she was to stay in the
hosiery department.  Ms. Hecht testified
that she also asked Ms. Martha White, the hosiery department manager, about
light duty and was told that she would have to talk to Ms. Martinez about it
because it was a decision that Ms. White could not make.

During this same
period, Ms. Hecht was undergoing physical therapy, which she did in the
mornings.  This treatments made it hard
to get to work on time.  She also
testified that even though she provided Ms. Honicker with the doctor=s excuses, Ms. Martinez, who was there
when she turned them in, both ladies would give her disapproving looks.  Ms. Hecht also testified that it was apparent
from their attitudes that they were frustrated with her every time she would
take in an excuse.  Because of those
attitudes, Ms. Hecht had asked Dr. Ruja to fax the excuses to Dillard=s in addition to her taking in a hard
copy.








Ms. Hecht
testified that when she went back to work, her back was very uncomfortable and
her pain would be obvious to anyone. 
However, Ms. Putman testified to the contrary that she never saw Ms.
Hecht appear to be in pain.  But, Ms.
White=s
testimony was that she had noticed that Ms. Hecht was stiff when she walked and
not moving around as before.  In a
similar vein, Ms. Elizabeth Price, who was then employed at Dillard=s as a mid-desk director, testified
that she saw Ms. Hecht several weeks after the injury, and Ms. Hecht looked old
and she could not sit properly in a chair. 
When she saw her at work, Ms. Hecht could hardly move around and that
her face looked very pinched and drawn. 
Ms Hecht also had complained to her about hurting and how she felt
management was constantly watching and harassing her.  Ms. Price testified that Ms. Hecht constantly
looked in pain and she was constantly crying after her injury.

Ms. Irene Briones,
who worked as a sales associate for Dillard=s
from November 1994 to August of 1999, testified that the week Ms. Hecht got
hurt, she looked pretty bad; she complained a lot about her back and was not
her usual self.  When Ms. Hecht returned
to work in June, Ms. Briones testified that she appeared to be happy, but
continued to complain about her back and about not being placed on light duty.

Ms. Hecht also
testified that when she returned to work, Ms. Putman would go into her area
very often, and sometimes ask her if she was working.  In one specific incident, Ms. Putman stated
that she was just checking to see if Ms. Hecht had shown up to work and was
working.  Ms. Hecht testified that when
this happened, she would try to push herself to do the stock as much as she
could and to keep up with her area, to keep Dillard=s
happy with her.  Sometimes Ms. Putman
would pass by her area when a customer was in the area as well, and she would
see an associate from the cosmetics counter get to the client before her, and
this would make Ms. Putman upset. 
Ms. Putman testified to the contrary, that she never watched Ms. Hecht
to make sure she was doing her job well. 
She also did not order anyone else to watch Ms. Hecht after she returned
to work.








Ms. Hecht also
provided testimony regarding changing the leg displays in her department.  According to Ms. Hecht, there are some fake
legs on a ledge that are more than eight feet tall which Ms. White forced her
to change.  Due to an upcoming visit from
Dillard=s
headquarters, Ms. White told Ms. Hecht to get a ladder in order to change some
displays.  Ms. Hecht testified that
she went upstairs and asked Ms. Gloria Villareal, housekeeping manager, for a
ladder, but Ms. Villareal did not give her one because of her condition.  Ms. Hecht then told Ms. White that Ms.
Villareal would not give her the ladder, that she was not in a condition to
carry the ladder and Ms. White told her that she might be jeopardizing that job
and that they were both in the same boat. 
She testified that normally, the visual department takes care of these
displays, but that this time, she changed them herself.  She testified that she climbed the ladder but
was in a lot of pain.

Ms. White
testified that she did not recall asking Ms. Hecht to change the leg displays
or to use a ladder.  Had she seen Ms.
Hecht doing so, she would have approached her and asked her why she was using
the ladder.  Had she found out Ms. Hecht
was using a ladder or had asked for one, she would have forbidden her from
doing so.  She further testified that
there should have never been a ladder in the hosiery department, that maybe at
most a stepping stool was needed.

Ms. Villareal
recalled someone requesting a ladder for Ms. Hecht.  She testified that a ladder usually weighs
about ten pounds, and that in this case, she took a small three or four step
ladder to Ms. Hecht.  At the time, Ms.
Hecht looked upset, like she had been crying; Ms Hecht told her that she had returned
to work and was being forced to do work that she could not and she was hurting.








Ms. Hecht
testified that she had also requested a mid-desk position.  The mid-desk position required you to sit in
the back room and receive orders from other stores for customers and to locate
items requested from another store as well. 
Ms. Hecht considered this a lighter duty position that did not require
constant lifting and bending.  Ms. Price
testified that Ms. Hecht had asked her if she thought she could perform the
duties of a mid-desk position.  Ms. Hecht
was interested in that position because she would not have to stand or sit for
long periods of time.

Ms. Putman
testified that she did not recall Ms. Hecht requesting to be transferred to a
mid-desk position.  In order for anyone
to be transferred, she testified that she would have to be part of that
conversation.  Ms. Martinez further
testified that Ms. Hecht never requested a 

mid-desk position.  She testified that she did not remember Ms.
Hecht approaching her about other positions that she could perform instead of
those required by the hosiery department. 
Ms. White also testified that Ms. Hecht never complained of not
being able to do her job, nor did she request to be transferred out of the hosiery
department.

Ms. Hecht also
testified that at some point, she requested a chair from Ms. Putman and was
told that she would get it for her, but Ms. Putman never did; eventually
someone else did provide her with a chair. 
The Saturday before she quit, Ms. Hecht testified that she saw a chair
in her department, but that she did not use it because she felt that if she
did, Dillard=s would
fire her.  A few days later, Ms. Putman
shouted at her that she was poison, and Ms. Hecht testified that this was the
last straw.  After this incident,
everybody stayed away from her; people did not want to talk to her anymore as
they normally would and they looked at her weird.  Ms. Putman made her feel humiliated.








Ms. Putman denied
calling Ms. Hecht poison.  Ms. Putman
testified that Ms. Hecht came to her and told her she was having problems
performing her duties and also asked for a chair.  Ms. Putman told Ms. Hecht that she could use
a chair but she did not provide one for her because she expected Ms. Hecht to
get it herself.

On August 4, 1998,
Ms. Hecht went to Dillard=s
to quit.  She testified that she did not
want to quit and that she liked her job, but she felt that she had to
quit.  She felt emotionally totally
destroyed and physically was not even able to drive, her heart was beating very
fast, her arms felt like ants were crawling on them, she saw everything very
far away, and was very upset and very down.

Ms. Putman, Ms. Martinez,
Ms. Honicker, and Ms. White all testified that they were in the office when Ms.
Hecht went in to resign.  Ms. White
remembered the day Ms. Hecht went in to resign, she was conducting some
interviews when she happened to leave her office at the same time Ms. Hecht was
coming in; she was quite surprised to see Ms. Hecht.  Ms. Hecht was with a woman and that when she
asked her what she was doing there, Ms. Hecht started to cry and said she was
quitting her job.  Ms. Hecht testified
that she went into the office and asked her why she was going to quit and Ms.
Hecht got hysterical and kind of lost it. 
She testified that Ms. Hecht was kind of shaky and was crying and
hysterical.  She testified that she was
surprised Ms. Hecht was going to quit; she did not know what led up to it
and that she had no idea what was going on. 
She also told Ms. Hecht that she needed to sign some separation papers
and that she needed to go into Ms. Honicker=s
office; she testified that Ms. Hecht would not fill out the paperwork.








Ms. Putman
testified that she heard loud talking in the outer office and she heard someone
was very upset and at that point, she went out to see what was going on.  She saw Ms. Hecht with a friend and
Dillard=s
employees Andrea Martinez, Deanna Honicker, and Martha White.  She testified that since Ms. Hecht was quite
upset, she stayed in the back.  She did
observe that Ms. Hecht seemed very upset and distraught; and the other Dillard=s employees were asking her if she was
going to resign.  She also told the jury
that Ms. Hecht did not appear to be rational or emotionally stable.  She finally related that on August 10, 1998,
she spoke to Ms. Hecht=s
husband and he notified them of her resignation and that no reason was provided
for the resignation.

Ms. Putman
testified that only she and Ms. Martinez had authority to fire an
employee.  She further testified that she
never threatened to fire Ms. Hecht after she filed her workers= compensation claim.  She further did not order anyone else to
threaten to fire Ms. Hecht, and was not aware of any of her managers doing
so.  She testified that Ms. Hecht was not
fired.

The next day, Ms.
Hecht testified that she went to the ER, where she was diagnosed with an
anxiety disorder and was referred to a psychiatrist.  Ms. Hecht continued to receive psychiatric
care for the remainder of 1998 and into 1999. 
Ms. Hecht filed a suit against Dillard=s
in which she asserted that she had been discriminated against because she had
filed a workers=
compensation claim in violation of Tex.Lab.Code
Ann. ' 451.001
or in the alternative, that she was discriminated against in retaliation for
exercising her rights under the Family and Medical Leave Act of 1993.  After a jury trial, Ms. Hecht was awarded
back pay, mental anguish damages, medical care in the past, and punitive
damages.  Dillard=s
timely filed this appeal.

Sufficiency
of the Evidence 








In Issue One,
Dillard=s
challenges the legal and factual sufficiency of the evidence presented to
support a finding of malice and award of punitive damages.  Dillard=s
argues that the Aevidence
would barely even support a finding of discrimination under Tex.Lab.Code ' 451.001.@ 
In Issue Two, Dillard=s
maintains that the evidence was legally and factually insufficient to support
the jury=s finding
that Dillard=s
discharged Hecht in retaliation for exercising her rights under the Texas
Workers=
Compensation Act and that she was constructively discharged.

Before addressing
the legal and factual sufficiency points, we must consider Ms. Hecht=s objection that Dillard=s did not preserve its factual
sufficiency point because it failed to file a motion for new trial.  A motion for new trial is required to
complain of factual insufficiency of the evidence to support a jury finding.  See Tex.R.Civ.P.
324(b)(2).  In this case, Dillard=s did not file a motion for new trial
and we must therefore find that Dillard=s
has failed to preserve its factual sufficiency issues on appeal.








In reviewing a
legal sufficiency challenge where the complaining party on appeal did not bear
the burden of proof at trial, we analyze the issue as a Ano‑evidence@ challenge.  Croucher v. Croucher, 660 S.W.2d 55,
58 (Tex. 1983).  In our review, we
consider the evidence in a light that tends to support the jury=s finding and disregard all evidence
and inferences to the contrary.  Southwest
Key Program, Inc. v. Gil‑Perez, 81 S.W.3d 269, 274 (Tex. 2002).  If there is more than a scintilla of evidence
to support the finding, the legal insufficiency challenge fails.  Formosa Plastics Corp. USA v. Presidio Eng=rs & Contractors, Inc., 960
S.W.2d 41, 48 (Tex. 1998).  We will
sustain a no‑evidence challenge when: 
(1) the record discloses a complete absence of evidence of a vital fact;
(2) the court is barred by rules of law or of evidence from giving weight to
the only evidence offered to prove a vital fact; (3) the evidence offered to
prove a vital fact is no more than a mere scintilla; or (4) the evidence
establishes conclusively the opposite of the vital fact.  Marathon Corp. v. Pitzner, 106 S.W.3d
724, 727 (Tex. 2003).  The evidence is no
more than a scintilla A[w]hen
the evidence offered to prove a vital fact is so weak as to do no more than
create a mere surmise or suspicion of its existence . . . .@ 
Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983).  More than a scintilla exists when the
evidence Arises to
a level that would enable reasonable and fair‑minded people to differ in
their conclusions.@  Transp. Ins. Co. v. Moriel, 879 S.W.2d
10, 25 (Tex. 1994).

Tex.Lab.Code Ann. ' 451.001 states:

A person may not
discharge or in any other manner discriminate against an employee because the
employee has:

 

(1)        filed a workers=
compensation claim in good faith;

 

(2)        hired a lawyer to represent the employee
in a claim;

 

(3)        instituted or caused to be instituted in
good faith a proceeding under Subtitle A; or

 

(4)        testified or is about to testify in a
proceeding under Subtitle A.

 

See Tex.Lab.Code Ann. 451.001 (Vernon 1996).








In order to
succeed on a claimed violation of Section 451.001, the employee must show that
the termination or other discrimination would not have occurred when it did but
for the employee=s
assertion of a compensation claim.  Continental
Coffee Products, Co. v. Cazarez, 937 S.W.2d 444, 450-51 (Tex. 1996).  Actual malice must be shown before punitive
damages may be assessed against an employer for violating Section 451.001.  Cazarez, 937 S.W.2d at 454.  Actual malice is defined as Aill-will, spite, evil motive, or
purposing the injuring of another.@  Id. at 452, citing Clements v.
Withers, 437 S.W.2d 818, 822 (Tex. 1969). 
By requiring evidence of ill-will, spite, or a specific intent to cause
injury to the employee, courts will ensure that only egregious violations of
the statute will be subject to punitive awards. 
Id. at 453.  The evidence
necessary to prove malice must be Aclear
and convincing.@  See Tex.Civ.Prac.&Rem.Code
Ann. '
41.003(a)(2)(Vernon Supp 2004-05); Forbes, Inc. v. Granada Biosciences, Inc.,
124 S.W.3d 167, 171 (Tex. 2003).  Clear
and convincing evidence is that measure or degree of proof that will produce in
the mind of the trier of fact a firm belief or conviction as to the truth of
the allegations sought to be established. 
Tex.Civ.Prac.&Rem.Code Ann.
' 41.001(2); Moriel, 879 S.W.2d
at 31.

Dillard=s argues that the following evidence
presented at trial showed that Dillard=s
did not act with the required malice needed for the punitive damages
award:  (1) Dillard=s insured Ms. Hecht received medical
attention when management was notified that she had suffered an injury; (2)
when Ms. Hecht returned to work, Dillard=s
placed her on what it considered to be the lightest duty available; (3) Dillard=s accommodated Ms. Hecht=s schedule so that she could attend her
physical therapy sessions; (4) Dillard=s
informed other associates to help Ms. Hecht and asked her to ask for help when
necessary; and (5) Dillard=s
never threatened to terminate Ms. Hecht.

The record
indicates that Ms. Hecht was provided with the necessary medical attention as
soon as Dillard=s
discovered her injury.  In accordance
with Dillard=s policy,
Ms. Hecht was sent to Concentra Medical, where she was treated for her
injury.  Dillard=s
did not dispute the injury.  Relevant to
the medical attention, Ms. Hecht=s
counsel stipulated that Appellant was paid all of her benefits.








Upon returning to
work on June 1, Ms. Hecht was restricted to light duty by her doctor and was
assigned to the hosiery department. 
According to Ms. Hecht, she was told by Ms. Martinez and Ms. Putman
that they would continue to look for a light duty position for her.  Ms. Hecht repeatedly asked for light duty and
complained about not being placed in a light duty position.

When an employee
is on workers=
compensation, Dillard=s
policy is if necessary, to create a job duty to meet any light duty
restrictions.  It appears that there was
some confusion as to Ms. Hecht=s
status since her original time off was documented as sick leave.  Ms. Putman testified that Ms. Hecht=s file did not indicate she was out on
workers=
compensation leave.  Ms. Putman
testified that she had reviewed the other departments and had determined that
the hosiery department required the least amount of heavy lifting.  Ms. Martinez also agreed that the lightest
department at Dillard=s
was hosiery and that even with the restriction placed on Ms. Hecht, upon
returning to work on June 1, she would have been able to return to the hosiery
department.  Ms. Putman indicated that in
the summertime, the hosiery department slows down given El Paso=s hot weather.  Ms. White also testified that in the months
that Ms. Hecht returned to the hosiery department, June through August, things
start to slow down.  From the evidence,
it appears that Dillard=s
made an effort to find a light duty position and a reasonable determination
that given Ms. Hecht=s
light duty restrictions, the best department for her was the hosiery
department.

After she received
her injury, Appellant had to attend physical therapy sessions.  She scheduled these in the morning before
work and was often late because of this. 
When she took in the excuses, Ms. Honicker and Ms. Martinez would often
get mad.  It was obvious to her that it
was frustrating to them that she was not at work on time.  








Ms. Putman
indicated that she did not get mad when Ms. Hecht requested for
accommodations.  Dillard=s accommodated Ms. Hecht=s schedule, allowing her the time to
attend physical therapy.  Ms. Hecht
preferred to attend physical therapy in the morning, so her start time was
adjusted to a later time.  Dillard=s additionally allotted Ms. Hecht time
to take care of some family matters, attend therapy, and then go to work.  Ms. Honicker testified that Ms. Hecht was not
penalized for attending physical therapy; she did not lose pay or time from
work.

When Ms. Hecht
returned to work, she made a requested to be placed in a mid-desk
position.  She also asked for a chair to
help her perform her job duties.  Ms.
Hecht testified that she did not receive any assistance from other associates
or was told to ask for assistance, and that she was the only person assigned to
the hosiery department.

Regarding the
chair, Ms. Putman approved the use of a chair. 
Ms. Putman, Ms. Martinez, and Ms. White all testified that Ms. Hecht did
not request a mid-desk position nor to be transferred from the hosiery
department.  Ms. Martinez indicated that
if Ms. Hecht needed assistance, she was supposed to ask for assistance.  Ms. White instructed the other associates to
help Ms. Hecht with whatever she needed. 
Ms. White also expressed concern over whether Ms. Hecht was staying
withing her limitations.  Ms. White noted
that she felt that Ms. Hecht was overdoing it and had to remind her to slow
down.

Ms. Hecht
testified that on August 4, she went to Dillard=s
to quit her job.  She did not want to
quit, but she felt like she had to quit. 
Ms. Price also offered supporting testimony that Ms. Hecht acted
like someone was forcing her to quit rather than as someone who was leaving
voluntarily.

Ms. Martinez, Ms.
Putman, Ms. White, and Ms. Honicker all represented unequivocally that Ms.
Hecht resigned voluntarily.  Ms. Putman
adamantly stated that she never threatened to fire Ms. Hecht after she filed
her workers=
compensation claim.  She did not order
anyone else to threaten to fire her and she was not aware of any of the other
managers doing so.








Ms. Hecht found
herself in a set of unfortunate events. 
Ms. Hecht had the misfortune to suffer a job related injury, closely
followed additional injuries resulting from a car accident, creating a
confusing situation for herself and Dillard=s.  The evidence, however, at best represents
that the situation may have not been handled in the best possible and most
ideal manner; however the evidence does not rise to the level of clear and
convincing evidence of malice. 
Therefore, we sustain Issue One.

Constructive
Discharge








In this case, Ms.
Hecht resigned from her position, therefore, the allegation is one of
constructive discharge.  Constructive
discharge occurs when an employer makes conditions so intolerable that an
employee reasonably feels compelled to resign. 
Green v. Industrial Specialty Contractors, Inc., 1 S.W.3d 126,
134 (Tex.App.--Houston [1st Dist.] 1999, no pet.); Hammond v. Katy
Independent School District, 821 S.W.2d 174, 177 (Tex.App.‑-Houston
[14th Dist.] 1991, no writ).  To find a
constructive discharge, a court must determine whether a reasonable person in
the employee=s
position would have felt compelled to resign. 
Id.  The focus is on the
reaction of a reasonable employee to the conditions created by the
employer.  Guthrie v. J.C. Penney Co.,
Inc., 803 F.2d 202, 207 (5th Cir. 1986). 
It is the conditions imposed which control, not the employer=s state of mind.  Borg-Warner Protective Services Corp. v.
Flores, 955 S.W.2d 861, 866 (Tex.App.-‑Corpus Christi 1997, no
pet.).  Thus, a plaintiff need not prove
that the employer subjectively intended to force the resignation.  Id. 
While general evidence of mere harassment, without more, is insufficient
to establish constructive discharge, evidence which shows a pattern of
retaliation and pervasiveness of the employer=s
negative attitude has been held sufficient to support such a finding.  See Passons v. University of Texas at
Austin, 969 S.W.2d 560, 564 (Tex.App.--Austin 1998, no pet.).

Viewing the
evidence in the light most favorable to the verdict, the records shows that
prior to her injury, Ms. Hecht was the model employee, well liked by her
coworkers and management.  She always had
a smile on her face and was willing to go well above her call of duty to serve
her clients.  Ms. Hecht unequivocally
stated that she did not want to quit her job; she testified that she loved
Dillard=s.  Ms. Hecht testified that she was made to feel
that she had no option other than to quit her job.

After suffering
the job related injury, Ms. Hecht was placed on light duty restrictions which
she reported to Dillard=s
management.  For the entire week
following her injury, Ms. Hecht was not able to work; she continually went
to work every day but was told that there was no light duty work available and
was sent home instead.  However, there
was evidence that Dillard=s
could have created a light duty position for her as they regularly do with
employees on workers=
compensation with light duty restrictions. 
Dillard=s however
displayed no desire to accommodate Ms. Hecht, which continued when Ms. Hecht
returned to work on June 1.

There is evidence
in the record that on several occasions, Ms. Hecht requested to be transferred
from the hosiery department.  Ms.
Martinez testified that there were several times a day when an associate in the
hosiery department would have to bend. 
She testified that associates are required not to leave stock out on the
floor and to get it off the floor before their shift ends.  Despite the fact that working in the hosiery
department was not light duty, Dillard=s
made no effort to find a better suited position for Ms. Hecht, and instead just
at they did at the initial stage of her injury, they kept telling her that they
were looking for a light duty position, but never provided such a position.








Instead, what the
evidence showed that Dillard=s
left Ms. Hecht in the hosiery department and proceeded to check on her often
and on occasion, make comments that the reason for stopping by was to make sure
Ms. Hecht was working or to see if she even showed up to work at all.  When Ms. Hecht requested a chair, Dillard=s negative attitude surfaced
again.  Ms. Putman=s
attitude was that she was not going to physically provide a chair for Ms.
Hecht.  She expected Ms. Hecht to get the
chair herself, even though she knew of her back injury.  By the time a chair finally appeared in her
department, Ms. Hecht testified that she was afraid to use it, for fear of
being fired.  Ms. Price remembered an
incident where Ms. Hecht was moving a large box, and when she asked her what
was going on and about her being on light duty, Ms. Hecht responded that she
had to do it and she was crying. 
Contrary to Ms. Putman=s
opinion, Ms Hecht testified that she could not leave the stocking
responsibilities for the associates on the next shift.  Ms. Martinez also made it clear that
associates were not to leave stock out on the floor and they must get if off
the floor before the next shift arrived. 
There were countless instances where Ms. Hecht felt forced to
perform beyond what her limits allowed because of Dillard=s negative attitude towards her
injury.  The negative attitude persisted
beyond Ms. Hecht=s work
performance to the estrange relationships Ms. Hecht had with her coworkers.

Ms. Hecht
recounted an incident between her and Ms. Putman where Ms. Putman yelled at her
in front of some other associates and called her poison.  After this incident, Ms. Hecht testified that
everybody stayed away from her; that people did not want to talk to her anymore
as they normally would and they looked at her weird.  Prior to her injuries, Ms. Hecht had a
history of getting along with all her coworkers and was well liked.  However, after her injury, Ms. Hecht found
herself ostracized from her coworkers because of Dillard=s
management=s
actions.








Dillard=s negative attitude to her injury was
evidenced early on as well with Ms. Honicker telling Ms. Hecht that she had to
pick up the paperwork right away and that she could not wait until her husband
did so later that afternoon, despite the knowledge that Ms. Hecht was hurt and
Ms. Hecht indicating to Ms. Honicker that she did not feel well.  This was followed by the negative reactions
Ms. Hecht received towards her need to attend physical therapy for her injuries
from Dillard=s
management.

Examining the
record, there was evidence of Dillard=s
pervasive unwillingness to accommodate Ms. Hecht=s
request for a light duty despite her complaints of not being able to perform
all her job duties, there were sly remarks and behavior towards Ms. Hecht=s attendance and work product made by
management, and there was an environment of tension and hostility created
between Ms. Hecht and her fellow associates created by Dillard=s management.  Looking at these conditions from a reasonable
employee=s
perspective, it is possible that these conditions were so intolerable that an
employee would have felt compelled to resign. 
We find that there is more than a scintilla of evidence on the record to
support the jury=s finding
that a reasonable person in the employee=s
position would have felt compelled to resign. 
As such, we overrule Issue Two.

Jury
Instruction

In Issue Three,
Dillard=s
complains of jury charge error. 
Appellant contends that the trial court submitted additional language
with the instruction on Tex.Lab.Code
Ann. ' 451.001,
which contained a standard of causation different from that mandated by the
Texas Supreme Court.  In so doing, the
jury was instructed with two separate instructions concerning the causation
standard to be met to establish a violation of Tex.Lab.Code Ann. '
451.001.








The standard of
review for alleged jury charge error is abuse of discretion.  See Tex. Dep=t
of Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex. 1990).  The test for abuse of discretion is not
whether, in the opinion of this Court, the facts present an appropriate case
for the trial court=s
actions.  Rather, it is a question of
whether the court acted without reference to any guiding rules and
principles.  See Downer v. Aquamarine
Operators, Inc., 701 S.W.2d 238, 241‑42 (Tex. 1985), cert. denied,
476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986); Amador v. Tan, 855
S.W.2d 131, 133 (Tex.App.-‑El Paso 1993, writ denied). 

The jury was
provided with the following instruction:

There may be more than
one cause for an employment decision.  An
employer does not discharge an employee for filing a workers= compensation claim if the employer
would have discharged the employee when it did even if the employee had not
filed a workers=
compensation claim.

 

It is not necessary
that the employee show the sole cause or only cause of her discharge was her
action in filing a workers=
compensation claim or taking other action to institute a workers= compensation proceeding.  Instead, the employee must show only that
her action in filing a claim or taking other actions to institute a worker=s compensation proceeding was a reason
for her firing, even if other reasons for her firing existed.  [Emphasis added].

 

Dillard=s
argues that the italicized portion of the instruction provided a causation
element reflecting Aa reason@ causation standard which significantly
differs from the Abut for@ causation standard adopted by the
Texas Supreme Court in Continental Coffee Products Co. v. Cazarez.  In so doing, Dillard=s
argues that the trial court abused its discretion.  

In Cazares,
the Court stated that a similar instruction should be given in actions under
the Anti-Retaliation Law as the ones provided in whistle blower actions.  Cazarez, 937 S.W.2d at 450.  The jury instruction Cazares refers to
is as follows:








An employer does not discriminate
against an employee for reporting a violation of law, in good faith, to an
appropriate law enforcement authority, unless the employer=s action would not have occurred when
it did had the report not been made.

 

Cazarez, 937 S.W.2d at 450.

In Housing
Authority of the City of El Paso v. Guerra, 963 S.W.2d 946
(Tex.App.--El Paso 1998, pet. denied), this Court was presented with the
same jury instruction issue.  Guerra
was also an appeal from a wrongful termination suit where a workers= compensation claim was filed.  Id. 
In that case, the exact instruction was given to the jury as the one
italicized above.  Id. at
953.  We recognized that the trial court
in Guerra did not have the benefit of the Cazarez opinion, but
stated the following:

[T]he trial court=s instruction that the retaliatory
motivation >was a
reason= for the
firing is sufficiently similar to the >but
for= language now prescribed by the Supreme
Court to properly apprise the jury of the correct causation standard.  Moreover, the trial court=s instruction followed the well‑established
rule that where statutory violations are the basis of jury questions, the
questions should be submitted in terms as close as possible to the language of
the statute.  The trial court=s instruction, after reciting the law
found in the statute, properly went on to address the causation standard
developed in case law.  Although the
Housing Authority=s
requested instruction may have been a correct statement of the law, we find
that it was not required for the jury to answer the controlling question, which
tracked the statute.  We conclude there
was no abuse of discretion in refusing to submit the Housing Authority=s instruction as submitted.

 

Guerra, 963 S.W.2d at 953-54
(citations omitted).  Unlike in Guerra,
in this case, the trial court was able to factor into its decision the Cazarez
decision.  We are not persuaded that the
jury instruction contained the wrong causation standard.

Tex.Lab.Code Ann. ' 451.001 states in relevant part:

A person may not
discharge or in any other manner discriminate against an employee because the
employee has:  

 

(1)        filed a workers=
compensation claim in good faith . . . .








 

In this case, we
also find that the instruction was in line with Section 451.001 and
sufficiently apprised the jury of the correct causation standard.  We find no abuse of discretion on the trial
court=s
part.  We therefore overrule Issue Three.

Because the
evidence to support the jury=s
finding of malice for exemplary damages was legally insufficient, we reverse
that portion of the trial court=s
judgment awarding punitive damages.  The
trial court=s
judgment is modified to delete the award of exemplary damages and, as modified,
is affirmed.

 

 

August
31, 2005

DAVID WELLINGTON
CHEW, Justice

 

Before Panel No. 2

Barajas, C.J, McClure, and Chew, JJ.











[1]
The restrictions included:  no repetitive
lifting over five pounds, no prolonged standing and/or walking longer than 30
minutes, no bending greater than zero times per hour, no pushing and/or pulling
over five pounds of force, no reaching above the shoulders, no squatting and/or
kneeling.